FAIRVIEW STATE BANK, a State Banking Association, Plaintiff,

v.

William S. EDWARDS, formerly dba D & B Brangus, aka Bill Edwards and Darinda J. Edwards, Donald W. Edwards, formerly dba D & B Brangus, aka Don Edwards and Debra J. Edwards, formerly Debra Joan Cole; United States of America, acting through Farmers Home Administration, and United States of America, acting through Small Business Administration, Defendants.

No. 63676.

Supreme Court of Oklahoma.

June 23, 1987.

Michael C. Bigheart, J. David Ezzell, McKnight & Gasaway, Enid, for plaintiff.

Nellie Perry, Perry, Gentry, Perry & Marsh, Hobart, for defendants/debtors.

William S. Price, U.S. Atty., Eleanor Darden Thompson, Asst. U.S. Atty., Oklahoma City, for U.S.

SIMMS, Justice:

Honorable Richard L. Bohanon, Bankruptcy Judge of the United States Bankruptcy Court for the Western District of Oklahoma, certified the following question of law on his own motion to this Court pursuant to he Oklahoma Uniform Certification of Questions of Law Act, 20 O.S. 1981, §§ 1601–1612:

> "Do validly perfected security interests in livestock, including their proceeds and products, attach to fees paid to the owner-debtors resulting from embryo transfers to surrogate cows?"

The initial complaint raised various issues, all of which have been determined by the trial court except for this certified question. The question has not previously been addressed by this Court, or apparently by any other court.

Under the facts presented to us, we answer this question in the affirmative. Because both creditors involved in this case have security interests in debtors' livestock, including increases, we conclude that these creditors also have security interests in the proceeds received by debtors from the sale of embryos produced by debtors' donor cows.[1]

Defendants/debtors William S. Edwards, Darinda J. Edwards and Donald W. Edwards formerly did business as D & B Brangus, and were engaged in farming and ranching operations near Fairview, Oklahoma, in Major County. They filed their petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code on January 24, 1984.

Plaintiff Fairview State Bank (Bank) and the United States of America, acting through Farmers Home Administration (FmHA) are secured creditors of Debtors.

Bank brought an action against Debtors and FmHA, seeking a declaration of its rights as a secured creditor. Bank claims that its security interest in Debtors' livestock includes payments received by Debtors from cattle embryo transfers. By counter-claim, Debtors seek a judgment declaring that the security interests of Bank and FmHA do not include these payments.

A general understanding of the embryo transfer procedure, and of the nature of the relationship between Debtors and the third party who contracted with them to implant the embryo transfer program, is helpful to our resolution of the certified question.

In July 1983, Debtors entered into a contract with Granada Land and Cattle Company, a cattle production operation that includes genetic engineering and embryo

---

1. Because it is outside the scope of the question certified to us, we do not address the issue of whether the security interests of the creditors in the proceeds from the embryo transfer program have been properly perfected under 12A O.S. 1984 Supp. § 9–306(3). For the same reason, we do not determine the extent of the creditors' interests in these proceeds as affected by the bankruptcy proceedings instituted by debtors. See, 12A O.S.1984 Supp. § 9–306(4). We note that the security agreement of Farmers Home Administration provided that disposition of collateral was not authorized without prior written consent. However, because the issue was not raised by the parties, we do not address the question of whether the Debtors made an unauthorized disposition of the collateral so that the third-party buyer took the embryos produced by Debtors' donor cows subject to FmHA's security interest. See, 12A O.S.Supp.1984, § 9–306(2), § 9–307.

transfer programs. Under the terms of their initial contract, Debtors agreed to send Granada twelve "donor cows," previously evaluated by Granada personnel as suitable for the embryo transfer procedure.

Apparently Debtors still have possession of their donor cows and continue to be involved in the embryo transfer program.

To implement this process, Granada gives fertility drugs to Debtors' donor cows in order to speed up egg production. Granada selects bulls to mate the Debtors' cows, and fertilization by a bull or by artificial insemination takes place at the Granada facility. The fertilized eggs (embryos) are "flushed" from the donor cows approximately a week after insemination or conception. The fertile embryos are then transferred to recipient cows owned by Granada, which serve as "surrogate mothers" and gives birth nine months after the embryo transfer to a calf with the genetic makeup of the donor cow.

Granada pays Debtors $500.00 for each pregnancy which is confirmed approximately 60 days after the transfer of an embryo to a recipient cow. By making this payment, Granada purchases from Debtors both the embryo and the calf which will result from it. In addition, Granada is responsible for all costs "relating to enrollment, health testing, embryo transfer and recipient cows" under the terms of the contract.

With the gestation and care of offspring delegated to recipient cows, the donor cows are free to be rebred and reflushed up to five times a year, each time yielding from one to five transferable embryos. Debtors agreed under the terms of their initial contract to leave their donor cows at Granada long enough to produce at least 100 pregnancies.

For the period during which Debtors' cows are bred and subsequently harvested of their embryos, the cows are located at the Granada facility. For the remainder of each year, the cows are returned to Debtors where they are bred and allowed to carry a calf for the full nine-month gestation period.

Debtors do not dispute that FmHA and Bank have security interests in Debtors' donor cows. The priorities of FmHA and Bank as to the donor cows have already been determined by the trial court. In addition, Debtors do not dispute that the "natural" offspring of the donor cows; i.e., the calves carried by the donor cows until birth, are the "products" or natural increase of the donor cows.

However, Debtors contend that the security interests of FmHA and Bank do not extend to payments received by Debtors for confirmed pregnancies resulting from the embryo transfer program. Debtors point out that none of the parties contemplated an embryo transfer program when they entered into security agreements covering the donor cows. Debtors argue that nothing in the security agreements they entered into with FmHA and Bank either forbids such use of the donor cows or provides for a security interest in the "products" or proceeds generated by such use.

We must first determine whether the security interests of FmHA and Bank attached to the embryos produced by Debtors' donor cows. The formal requirements for the attachment of a security interest are set out in 12A O.S.Supp.1984, § 9–203,[2] which provides in pertinent part:

"(1) ... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless: (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral, ...; (b) value has been given; and (c) the debtors has rights in the collateral.

---

**2.** The security agreement between Debtors and FmHA was executed in 1979, and the security agreement between Debtors and Bank was executed in 1983. 12A O.S. § 9–203 was substantially amended in 1981. Additional changes which are not applicable to this case were made in 1984. However, the basic requirements governing attachment of a security interest remain the same. See, 12A O.S.1981 §§ 9–203(1), 9–204(1); *Morton Booth Co. v. Tiara Furniture, Inc.*, Okl., 564 P.2d 210 (1977).

(2) ... Attachment occurs as soon as all of the events specified in subsection (1) of this section have taken place unless explicit agreement postpones the time of attaching."

■ The first requirement for attachment of a security interest where the collateral is not in the possession of the secured party is that the security agreement signed by the debtor describe the collateral. 12A O.S.1981, § 9–110 provides that:

"For the purposes of this Article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

We must determine whether the security agreements executed by Debtors in favor of FmHA and Bank contain descriptions of Debtors' collateral that can reasonably be interpreted as identifying and including embryos produced by Debtors' donor cows.

To secure payment of promissory notes, Debtors executed a security agreement with FmHA on June 25, 1979. The security agreement included the following description of collateral:

"Item 3. *All livestock* (except livestock and poultry kept primarily for subsistence purposes), fish, bees, birds, furbearing animals, other animals produced or used for commercial purposes, other farm products, and supplies, *now owned or hereafter acquired by Debtor, together with all increases,* replacements, substitutions, *and additions thereto, ...*" (emphasis added)

A security agreement between Bank and Debtors, dated March 7, 1983, includes an attached list describing the collateral pledged by Debtors as security. Among the livestock listed as collateral are "10 Donar (sic) Cows Brangus." The description of collateral is followed by this language:

"... This security interest also includes *all additions and replacements to the property, along with all proceeds* I might receive or be entitled to from the sale of the property. ... This security interest will also secure any other or future debts of mine to you and will

include *any after-acquired property.*" (emphasis added)

Additional language, appearing on the reverse side of the same security agreement, provides that:

"... *This security interest also includes all additions, replacements, increases in the property and after-acquired property.* Also included in this security interest will be proceeds from the sale of the property, ... If the property I have pledged as security includes livestock, *I grant to the bank a security interest in all increases in that livestock ...*" (emphasis added)

We are not persuaded by Debtors' argument that these security agreements did not grant FmHA and Bank security interests in the embryos produced by Debtors' cows.

The Uniform Commercial Code contemplates and approves security agreements which provide that the obligations will be secured by after-acquired collateral. 12A O.S.1981 § 9–204(1). By the use of an after-acquired property clause, an entire herd can be covered by a security agreement without specific identification of each animal. As the debtor acquires new livestock by birth or purchase, the after-acquired clause automatically covers these additions. Thus, general descriptions of livestock as collateral are not uncommon in security agreements between farm lenders and debtors engaged in livestock breeding operations. See, *In re Malzac,* 14 U.S.C.Rep. 1223 (D.C.Vt.1974); *Barth Bros. v. Billings,* 17 U.C.C.Rep. 237, 68 Wis.2d 80, 227 N.W.2d 673 (1975); *United States v. Southeastern Mississippi Livestock Farmers Association,* 29 U.C.C.Rep. 311, 619 F.2d 435 (5th Cir.1980).

The security agreements executed by Debtors in favor of FmHA and Bank both include provisions covering Debtors' after-acquired livestock. In addition, it is clear from the language contained in the security agreements that FmHA and Bank intended to take, and Debtors intended to give, a security interest in the increase of Debtors' herd.

■ "Increase" is defined as including the issue or offspring of animals. Black's Law Dictionary, 5th Ed. The embryos produced by and removed from Debtors' donor cows clearly are "increases" in Debtors' livestock. That these increases are purchased by Granada prior to birth of the calves does not change the nature of the basic contractual relationship.

Although the process by which the fertilized embryos are removed from Debtors' cows and inserted into recipient cows is unusual, the contract between Debtors and Granada is relatively simple. Under the terms of the contract, "Granada will select bulls to mate the cows and *purchase* from the D & B Brangus all the resulting pregnancies." (emphasis added) Thus, Granada agreed to purchase embryos produced by Debtors' donor cows; i.e., to buy the unborn offspring of Debtors' cows.

Such a contract is contemplated by the Uniform Commercial Code. The Code's definition of goods includes "the unborn young of animals." 12A O.S.1981 § 2–105(1). The Uniform Commercial Code Comments following § 2–105 note that the young of animals are expressly included in the definition of goods because "they, too, are frequently intended for sale and may be contracted for before birth."

■ Debtors' contentions that the embryos do not constitute after-acquired collateral because the transfer program was not contemplated by the parties to the security agreements are analogous to the arguments raised by a debtor in *In re Fairchild*, 31 B.R. 789, 36 UCC Rep.Serv. 655 (B.Ct.S.D.Ohio 1983). In *Fairchild*, a debtor granted a security interest to a creditor in, *inter alia*, all "hogs" and "all property similar to that listed ... which at anytime may hereafter be acquired." Debtor contended that the creditor had financed only his hog "feeder" operation and that his change to a hog "breeder" operation had removed his livestock from the creditor's after-acquired property clause. The court refused to permit divestment of the collateral of a secured creditor by a mere change in debtors' farming operations.

Likewise, we conclude that Debtors cannot use the embryo transfer program to avoid the security interest of FmHA and Bank.

The descriptions of collateral contained in the security agreements executed by Debtors in favor of FmHA and Bank are such that the collateral secured includes the embryos produced by Debtors' donor cows. Any other conclusion would disrupt routine financing arrangements on a large scale and might encourage Debtors to change their method of operation by simply selling embryos and thus avoid the security interest of creditors in the security interest of creditors in the increase of the herd.

Because Debtors signed security agreements which reasonably described this collateral, the first requirement under § .9–203 for attachment of the security interests of FmHA and Bank is met.

■ Debtors do not dispute that Bank and FmHA gave value to Debtors in the form of loans as consideration for the security agreements and promissory notes. Thus, the second requirement under § 9–203 for attachment of their security interest is also met.

■ The third requirement for the attachment of a security interest is that Debtors have rights in the collateral. We find that Debtors' rights in the embryos arise when the eggs produced by Debtors' donor cows are fertilized and the embryos come into existence.

Goods must be both existing and identified before any interest in them can pass. 12A O.S.1981 § 2–105(2). Thus, Debtors could not have passed an interest in the embryos to Granada unless they first had rights in the embryos. In the case of the sale of unborn young, identification of goods to a contract occurs "when the young are conceived." 12A O.S.1981 § 2–501.

When the embryos were conceived, i.e., came into existence, they were immediately identified in the contract, and Debtors' rights in the embryos arose. Debtors then passed this right or interest to Granada under the terms of their contract.

Granada agreed to pay Debtors "$500.00 for each pregnancy when confirmed at approximately sixty (60) days after transfer." We need not determine at what point Debtors' rights in the embryos are actually transferred to Granada. It is clear that there is a period of time, however short, during which Debtors have rights in the embryos.

When Debtors acquire rights in the embryos, the last event necessary in order for the attachment of the security interests of FmHA and Bank in the embryos occurs. 12A O.S.1984 Supp. § 9–203(1), (2).

We conclude that the security interests of FmHA and Bank in Debtors' livestock attach to the embryos produced by Debtors' donor cows when Debtors acquire rights in the embryos.

We next turn to the question of whether the security interest of FmHA and Bank in the embryos extends to the payments received by Debtors for those embryos.

Under 12A O.S.Supp.1984 § 9–306(1), "proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds.

A creditor whose security interest in collateral has attached is given an interest in proceeds from that collateral under 12A O.S.Supp.1984 § 9–203(3), which provides:

"Unless otherwise agreed, a security agreement gives the secured party the rights to proceeds provided by Section 9–306 of this title."

The language of the security agreement executed by Debtors in favor of Bank plainly includes the right to proceeds. There is no indication that proceeds are not covered in the language of the security agreement executed by Debtors in favor of FmHA.[3]

All the Justices concur.

---

3. The Oklahoma legislature substantially amended 12A O.S. § 9–203 in 1981 to include the language of § 9–203(3). That language was not altered when additional changes to § 9–203 were made in 1984. Again, we note that the security agreement between Debtors and FmHA was executed in 1979. That security agreement does not mention proceeds, although proceeds were expressly mentioned in financing statements that were filed by FmHA. However, no argument is made that FmHA's security agreement does not include proceeds. Prior to 1981, Oklahoma's version of the UCC did not expressly provide that a security agreement automatically gives a secured party the right to proceeds of the secured collateral. However, the inclusion of proceeds is implied by the language of 12A O.S.1971 § 9–306(2), which provides that a security interest continues in any identifiable proceeds—without indicating that a security agreement must specify that proceeds are covered. We note the following presumption stated in 12A O.S.1981 § 11–107: "Unless a change in law has clearly been made, the provisions of this act shall be deemed declaratory of the meaning of the U.C.C. prior to his act."