**In the Matter of STOOKEY HOLSTEINS, INC., Debtor.**

**MIDWEST COMMERCE BANKING COMPANY, Plaintiff,**

v.

**STOOKEY HOLSTEINS, INC., and Select Embryos, Inc., Defendants.**

**Bankruptcy No. 86–31174–RKR. Proc. No. 88–3109.**

United States Bankruptcy Court, N.D. Indiana, South Bend Division.

March 19, 1990.

William A. Thorne, Steven L. Hostetler, Lee Lorentzen, and J.A. Whitmer, Mishawaka, Ind., for plaintiff.

Eric C. Redman and John W. Dailey, Jr., Indianapolis, Ind., for defendant, Stookey Holsteins, Inc.

Aladean M. DeRose, South Bend, Ind., for Select Embryos, Inc.

## ORDER

ROBERT K. RODIBAUGH, Bankruptcy Judge.

On July 12, 1988, Midwest Commerce Banking Company ("Midwest") filed its Complaint to Determine Extent and Priority of Liens in Property of the Estate against Stookey Holsteins, Inc., the debtor-in-possession, and Select Embryos, Inc. ("Select"). The parties filed their Joint Stipulation of Facts on February 16, 1989, and the court took the matter under advisement on March 31, 1989, following the time allowed for submitting briefs.

### Background

The parties stipulated to the following facts which are relevant to this proceeding:

1. On September 3, 1986, Stookey Holsteins, Inc. (hereinafter referred to as the "Debtor") filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code and has, thereafter, continued to operate its business as Debtor-in-possession.

2. [Select] is a corporation organized and existing under the laws of the State of Ohio and has its principal place of business in Plain City, Ohio.

3. Debtor is indebted to [Midwest] by virtue of two (2) Promissory Notes....

4. The unpaid balance on the Promissory Notes ... was One Million Seven Hundred Thirty-seven Thousand Sixty-six and 40/100 Dollars ($1,737,066.40) as of the date of the filing of Debtor's petition herein, plus interest accruing thereafter at the rates set forth in the aforesaid Promissory Notes. Since the filing of Debtor's petition, approximately Nine

Hundred Thousand Dollars ($900,000.00) of this indebtedness has been paid.

5. Pursuant to Orders entered by this Court on January 5, 1987, and July 24, 1987, ... Midwest was granted super priority liens on all assets of the estate, including all farm products of the Debtor. Midwest has advanced approximately Four Hundred Fifty Thousand dollars ($450,000.00) pursuant to said Orders, which sum is secured by the super priority liens granted by this Court. Select was not listed as a creditor on the list of creditors provided by the Debtor at the commencement of its Chapter 11 proceeding and, therefore, Select did not receive notice of the Application for Super Priority Liens filed with the court, nor did it receive notice of the orders of super priority liens entered pursuant thereto.

6. By virtue of the Security Agreement and Financing Statements ... Midwest has a valid and duly perfected security interest in all collateral described in said Security Agreements and Financing Statements.

7. Select has in its possession three hundred twenty-six (326) frozen embryos produced from Debtor's donor cows (hereinafter referred to as the "Embryos")....

8. On or about July 19, 1982, Select and Jack E. Stookey, President of Debtor, in his individual capacity, entered into two (2) separate Embryo Transfer Agreements.... Of the three hundred twenty-six (326) frozen embryos in the possession of Select, eighteen (18) resulted from the embryo transfers performed pursuant to the Embryo Transfer Agreements.... All other Embryos arose from one or more oral agreements reached by the Debtor and Select after July 19, 1982.

9. In 1986, an oral agreement was reached between Select and Debtor, through its President, Jack E. Stookey, for a volume discount program concerning recovery and freezing of embryos from donor cattle located at the premises of Stookey Holsteins, Inc.

10. The program charges agreed upon by Debtor and Select as a part of their oral agreement reached in 1986 were as follows:

Recovery fee of $50.00 per donor

Freezing fee of $100.00 per donor regardless of number of frozen embryos

Travel of $500.00 per truck

11. Pursuant to the oral agreement reached in 1986, eleven (11) trips were made to Stookey Holsteins, Inc. by Select with a total of seventy-two (72) recoveries performed and three hundred twenty-six (326) embryos frozen. The total charges incurred by Debtor to Select were Fourteen Thousand One Hundred Fifty-five Dollars ($14,155.00)

12. Pursuant to the oral agreement reached in 1986, Select provided the schedules and drugs to superovulate the donor cattle (i.e., produce more than one egg or embryo, as in the natural ovulation cycle). Seven (7) days after the cows were inseminated by the Debtor, members of the Select staff flew or drove to the Debtor's farm in Leesburg, Indiana, where they flushed the donors and froze the resulting embryos. All embryos recovered remain in controlled frozen storage at the Select facilities in Plain City, Ohio.

Joint Stipulation of Facts ("Stipulation") (February 16, 1989).

In its complaint Midwest alleges that it has a perfected first priority interest in 326 frozen embryos produced from Stookey Holstein, Inc.'s donor cows which Select currently possesses. Select refuses to turn the embryos over to the debtor asserting that it rightfully holds them as collateral for expenses it incurred in producing the embryos. Midwest asserts, however, that Select's interest is inferior and subordinate to its own and accordingly asks the court to determine the extent and priority of the parties' conflicting interests in the embryos. In its brief in support of its position Midwest notes that in the Stipulation Select conceded that Midwest has a "valid and duly perfected security interest in all collateral described in said Security Agreement and Financing Statement." Midwest's

brief at 2 (citing Joint Stipulation at ¶ 6). Midwest submits that the embryos are part of the collateral set forth in the Security Agreement and Financing Statement as "farm products." *Id.* Inasmuch as the embryos are the young of the debtor's livestock, Midwest submits that they are subject to Midwest's perfected security interest. Midwest cites *Fairview State Bank v. Edwards*, 739 P.2d 994 (Okla.1987), in support of its position.

Midwest further argues pursuant to Ind. Code § 26–1–9–203(1)(a) that Select has no valid security interest in 308 of the 326 embryos. Midwest notes that Select admitted in the Stipulation that it obtained 308 of the 326 embryos from the debtor by oral agreement and only 18 of the embryos pursuant to written agreements. As Select fails to allege that the debtor specifically granted it a security interest in the embryos, Midwest submits that it has failed to meet the requirements of Ind.Code § 26–1–9–203(1)(a) for obtaining a valid security interest. Midwest's brief at 4–5.

Midwest argues that its security interests in both the embryos which Select obtained by oral agreement from the debtor and the embryos subject to the parties' written agreement are superior to Select's in that its interests were perfected first. *Id.* at 5. Specifically, Midwest submits that its security interests in the embryos were perfected when the embryos came into existence at the time the eggs produced by the debtor's cows were fertilized in June, July, and August of 1986. *Id.* Midwest contends that at the earliest Select perfected its interests in the 18 embryos obtained by written agreements with the debtor when Select came to Indiana and took possession of the embryos seven days after fertilization of the debtor's cattle. *Id.* Hence, Midwest submits that its interest is superior. Midwest contends Indiana law is controlling for purposes of determining the priority of interests in this case because the embryos came into existence in Indiana and because Select took possession of the embryos in Indiana. Midwest notes, though, that as both Indiana and Ohio have adopted similar version of the Uniform Commercial Code, the choice of law issue herein is not integral. *Id.* at 6.

Select in turn argues in its brief that the law of Ohio applies in this matter inasmuch as Select is an Ohio corporation and the embryos came into their present state in Ohio. Select's brief at 1. Select acknowledges that the law of Ohio and Indiana is substantially the same in the area of secured transactions. *Id.* Select asserts that the embryos are not covered by Midwest's financing statement in that they are not "farm products" within the meaning set forth in Midwest's financing statement. *Id.* at 3. Select notes that the embryos currently are frozen in a storage receptacle and submits that they are not "offspring" or "the young" of livestock until they successfully are implanted in a recipient cow. *Id.* at 2–3. Select contends the embryos never become offspring or young of livestock if the transfer is unsuccessful. *Id.* Similarly, Select argues that the embryos are not "products of livestock in their unmanufactured state" submitting that if Midwest had intended to include embryos within the scope of the financing statement it should have listed them by name. *Id.* at 3–4.

Select further argues that it has an artisan's lien on the embryos pursuant to Ind. Code § 26–1–9–310 and/or Ohio Code § 1309.29 which is superior to Midwest's alleged interest in the embryos. Select indicates that it obtained the artisan's lien by "provid[ing] the schedules and drugs to super ovulate the debtor cattle" and "flush[ing] the donors and fr[eezing] the resulting embryos" which remain in its possession. *Id.* at 7. As Stookey owes it $14,155 for its services and Select possesses the embryos, Select contends its artisan's lien is prior to Midwest's alleged security interest. *Id.* at 8.

Midwest counters that Select's alleged interest in the embryos is not an artisan's lien within the meaning of Ind.Code § 26–1–9–310 because Ind.Code § 32–8–30–9 requires a party to issue a receipt to the person entrusting property to it in order to create a valid lien in the property. Midwest's reply brief at 9

(March 28, 1989). Midwest relies upon this court's previous Order in *Lakeside Dairy Farms, Inc. v. Midwest Commerce Banking Co.*, Adv. Proc. No. 87–3014 and *Tucker v. Capital City Riggers*, 437 N.E.2d 1048 (Ind.App.1982), in stating that Select's failure to comply with Ind.Code § 32–8–30–9 renders its lien invalid. *Id.* at 10.

In reply [1] Select argues that Midwest has no perfected security interest in the embryos because it failed to file a financing statement in Ohio within four months after the embryos were moved to Ohio. Select's reply brief at 2 (April 3, 1989). At a minimum, Select contends its unperfected security interest in the eighteen embryos covered in its security agreement with Stookey is superior to Midwest's unperfected interest inasmuch as it obtained its interest prior to the time Midwest obtained its interest. *Id.* at 2.

Select further argues that if Midwest's security interest in the embryos is unperfected for failure to file in Ohio, Select's artisan's lien is superior to Midwest's unperfected interest even though notice of the lien was not given. *Id.* at 3. Select first submits that the notice required by Ind.Code § 32–8–30–9 was not necessary in this instance because Stookey did not deliver the embryos to Select at its place of business as contemplated by Ind.Code § 32–8–30–9. Instead, Select produced the embryos at Stookey's business and then took them from the premises. *Id.* Select asserts that by granting Select complete possession of the embryos, Stookey waived its right to notice of Select's right to sell the embryos for charges incurred in their production and storage. *Id.* Second, Select states that the prior course of dealing between Stookey and Select gave Stookey's officer notice of Select's rights. Specifically, Select relies upon Exhibits "L" and "M" attached and made a part of the Stipulation which are agreements between Stookey

and Select providing that Select has a "good and valid lien on all property of the owner in the possession of SEI for the just value of the labor and skill applied by professional staff of SEI [ ...] and for all expenses incurred in the keeping and caring for such property." *Id.* at 4 (quoting Exhibits "L" and "M" to the Stipulation). Hence, Select submits that its statutory lien is superior to Midwest's later perfected security interest. *Id.* (citing *Peoples State Bank of Clay Co. v. Thompson*, 462 N.E.2d 1068 (Ind.App.1984)).

## Discussion and Decision

This order shall represent findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable in this proceeding by Bankruptcy Rule 7052. Title 28 U.S.C. § 157 provides that "determinations of the validity, extent, or priority of liens" are core proceedings to be determined by the bankruptcy court. 28 U.S.C. § 157(b)(2)(K) (Callaghan 1989). The court first will address the nature of Select's interest in the embryos and then will proceed to determine its priority with respect to Midwest's interest.

### 1. The nature of Select's interest in the embryos

State law controls in determining whether Select holds an artisan's lien in the debtor's property. The artisan's lien is "a possessory lien upon goods for the costs of services rendered by the artisan in repairing, processing or manufacturing the goods." Ind.Code § 26–1–9–310 Indiana comment. Under Indiana law the artisan's lien is a common law lien which has been reenforced by statutes, such as Ind.Code 32–8–30–1 et seq., which provide various rights and remedies to the artisan holding a lien against the debtor's property. *Id.*[2] In Ohio, the common law artisan's lien has been codified in § 1333.41 of the Ohio Re-

---

1. On April 3, 1989, Select filed its motion to submit additional authority concerning Midwest's challenge of Select's alleged artisan's lien. The court granted Select's motion on April 11, 1989, and overruled Midwest's objection thereto. In its Order of April 11, 1989, the court agreed

to consider Select's additional authority in light of the parties' Stipulation.

2. In other words, although the Indiana legislature has not codified the artisan lien itself, it has codified various means of enforcing the lien.

vised Code. Section 1333.41 states in relevant part:

(A) Except as provided in division (E) of this section,[3] a bailee for hire who performs services or provides materials with respect to any personal property, has a lien on the personal property to secure the reasonable value of the services he performs and the materials he provides. *The lien shall be subject to prior recorded liens on the personal property....*

Ohio Revised Code Ann. § 1333.41(A) (Baldwin 1989) (emphasis added). Contrary to the law in Indiana, Ohio law thus appears to provide that statutory liens of bailees who perform services with respect to personal property are inferior to prior recorded liens on the property.[4] The court must look to conflict of laws rules to determine whether Indiana or Ohio law applies in this situation.

■ Generally, the law of the place where a lien on personal property is created governs the validity and effect of the lien. 16 Am.Jur.2d *Conflict of Laws* § 50 at 84 (1979) (citing *Universal Credit Co. v. Reising*, 32 Ohio NP NS 86, *aff'd*, 50 Ohio App. 289, 198 N.E. 52 (1935) along with other cases). More specifically, conflict of laws rules provide that "if as an incident to a contract a person has acquired in one [state] a statutory lien on movables, such lien will be recognized as against the lienor[5] in another jurisdiction to which the property is subsequently removed...." 15A C.J.S. *Conflict of Laws* § 18(6) at 500 (1967). Stated another way, "where personal property subject to a valid lien in the state of its situs is removed to another state, ... the lien, by virtue of the doctrine of comity, remains good...." 53 C.J.S. *Liens* § 10 at 472 (1987). *See also* 16 Am.Jur.2d *Conflict of Laws* § 51 at 85 (1979) ("A lien which is created by the lex loci contractus ... will generally, although not universally, be respected and enforced in all places where the property is found....") (citations omitted).

■ In this case Select, an Ohio corporation with its principal place of business in Ohio, came to Indiana and performed services in producing the embryos in controversy by furnishing schedules and drugs to "superovulate" the debtor's cattle and flushing the embryos from the cattle. Pursuant to its agreement with the debtor Select then transported the embryos to Ohio where it keeps them in frozen storage. Inasmuch as a statutory lien is deemed to come into existence when the bailor delivers the chattel to the bailee,[6] the

---

**3.** Division E of § 1333.41 states that the section does not apply to bailees for hire performing services on motor vehicles, bailees authorized to sell clothing or household goods, and certain other bailees. Ohio Revised Code Ann. § 1333.41 (Baldwin 1989).

**4.** Uniform Commercial Code § 9–310, adopted as Ind.Code § 26–1–9–310 in Indiana and Ohio Revised Code § 1309.29 in Ohio states:

When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

Ind.Code Ann. § 26–1–9–310 (Burns 1974) and Ohio Revised Code § 1309.29 (Baldwin 1989). Otherwise, Article 9 does not apply to statutory liens. *See* Ind.Code Ann. § 26–1–9–102(2) (Burns Supp.1989) and Ohio Revised Code § 1309.02(B) (Baldwin 1989).

**5.** The court assumes the commentator intends "lienee" rather than "lienor" inasmuch as there would be no need to enforce a lien against the one who holds the lien.

**6.** 8 C.J.S. *Bailments* § 80 at 314 (1988) (citations omitted). This commentator further notes that at least one court has held that a bailee's lien arises when his contract for services is completed. *Id.* (citing *Malsby & Co. v. Widincamp*, 32 Ga.App. 716, 124 S.E. 730 (1924)). The court believes that literally applying this approach in effect would deny a lien to the artisan who has performed substantial services with respect to a bailor's personal property but who continues to possess and care for the property while waiting for payment under his contract with the bailor. As the artisan has not stopped providing services to the bailor's personal property thereby completing the contract, he would have no lien. This court accordingly believes that the rule which states that a statutory lien comes into existence when the bailee takes possession of the property is the more equitable and sensible rule of law particularly when the parties have not specified the term of the bailment in their contract.

court finds that Select obtained an artisan's lien on the debtor's embryos at the moment it took possession of them. in Indiana. Moreover, the court concludes that Select's lien applies to all of the services which it rendered with respect to the debtor's embryos, including those services rendered in Ohio.[7] The court recognizes that Select arguably may have artisan's liens in the embryos in both Indiana and Ohio inasmuch as it performed some services in Indiana and some services in Ohio. Considering all of the relevant factors, however, the court concludes that because Select performed the substantial part of its services in Indiana and took possession of the embryos in Indiana, Indiana law should apply to the dispute at hand.

The court believes that this result is consistent with the modern "grouping of contacts" or "center of gravity" doctrine applicable in determining other conflict of laws questions. *See generally,* 15A C.J.S. *Conflict of Laws* § 8(1)–(4) (1967) and 16 Am. Jur.2d *Conflict of Laws* §§ 83–84 and §§ 102–103 (1979) and the cases cited therein. Certainly, in this case Select performed the major part of its services on behalf of the debtor in Indiana. In addition, Select took possession of the embryos in Indiana. The court accordingly finds that the state most intimately connected and concerned with the litigation arising over Select's artisan's lien is Indiana and determines that Indiana law should apply.[8]

Midwest argues that Select does not have a valid artisan's lien under Indiana law because it has failed to comply with Ind.Code § 32–8–30–9 by supplying an appropriate receipt to the debtor. Reviewing the relevant Indiana statutes as well as its previous orders concerning this issue,[9] however, the court finds that this argument is not persuasive. As the court has stated, in Indiana the common law artisan's lien has been bolstered by statutes, such as Ind.Code § 32–8–30–1 et seq., which provide various rights and remedies to the

7. In conjunction with this finding the court further finds that Select did not adversely affect its Indiana artisan's lien by moving the embryos to Ohio. Another integral factor in the court's finding is that Select and the debtor apparently did not intend for the embryos to acquire permanent situs in Ohio. The embryos were to be kept in Ohio only until appropriate recipient cattle could be found.

8. The court believes this conclusion is particularly appropriate in light of *Mack Financial Corp. v. Kenworth of Cincinnati, Inc.,* No. C–7–790740, slip op., 1981 WL 9818 (Ohio App. June 3, 1981) (citing Restatement 2d of Conflict of Laws at 251 (1971)), which determined that the law of the state with "the most significant relation to the parties, the vehicle and the encumbrances" should govern a dispute between the holder of an artisan's lien for repair of a motor vehicle and a prior perfected secured party.

The court determines that the fact that the written agreement between Select and the debtor concerning 18 of the 326 embryos states that Ohio law will govern disputes arising under the agreement is not controlling in its inquiry concerning the law which should apply to Select's alleged artisan's lien. Importantly, the question before the court involves only whether Select has a valid artisan's lien which is superior to an alleged lien of Midwest, one of the debtor's creditors, and the priority of such lien.

The mere fact that Midwest stands in the shoes of the debtor pursuant to the court's order authorizing Midwest to collect the debtor's outstanding receivables has no definitive effect in determining which state's law controls the validity of the artisan's lien. As one commentator states: "The lien ... is entirely distinct from the debt or obligation which it secures, it being but an incident of the debt or obligation and a remedy therefor...." 8 C.J.S. *Bailments* § 80 at 314 (1988). The validity of a lien for services thus is a matter which the court must determine by looking to the law of the state in which the lien arose. This law is not necessarily the same as that which the parties to a bailment contract select to govern their agreement.

9. The court notes that it has issued two conflicting rulings on similar issues in adversary proceedings in this case. On April 6, 1988, the court in *Lakeside Dairy Farms, Inc. v. Midwest Commerce Banking Co., Summit Bank, and Stookey Holsteins, Inc.,* Adv.Proc. 87–3014, determined that inasmuch as the plaintiff failed to comply with the statutory requirement of § 32–8–30–1 et seq., it had no valid and enforceable lien against the debtor's livestock. In turn, upon revisiting the effect of Ind.Code § 32–8–30–9 on Ind.Code § 32–8–29–1 in *Stookey Holsteins, Inc. v. Schuyler Van Voorst and John Van Voorst,* Adv.Proc. 87–3082, the court found that Schuyler Van Voorst held a valid agister's lien in the debtor's cattle despite the fact that he did not comply with notice provisions of § 32–8–30–9 (September 20, 1989).

artisan's lienholder.[10] This fact alone, however, does not foreclose a bailee from relying upon the rights and remedies provided at common law to enforce his artisan's lien.[11]

■ Ind.Code § 32–8–30–9, made applicable to bailees who have liens for their services in caring for another's personal property by Ind.Code § 32–8–30–4, requires a bailee taking advantage of Ind.Code § 32–8–30–1 et seq. to issue a receipt to the person entrusting property to him. Importantly, § 32–8–30–9 does not purport to require all bailees to issue receipts to their bailors; it only requires those bailees taking advantage of the provisions of Ind.Code § 32–8–30–1 et seq. to issue such receipts. The section does not preclude a bailee from asserting a common law lien if he has not issued a receipt to the bailor upon entrustment and has not taken advantage of the provisions of Ind.Code § 32–8–30–1 et seq. in enforcing his lien.

The court thus finds that Select is not foreclosed from asserting its lien in the debtor's embryos. Ind.Code § 32–8–30–9 is inapplicable to Select because Select has not exercised its right to sell the embryos. The court concludes that this result is consistent with the "plain meaning rule" of statutory construction which requires a court to look to the language of the statute itself, and if the language is clear on its face to rely solely on the statute without referring to other sources. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). *See also United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), for a recent discussion of the "plain meaning rule." Even if the court were inclined to look to other material in interpreting Ind.Code § 32–8–30–1 et seq. as it applies to artisan's liens, the court notes that Indiana has no legislative history and no published decisions are directly on point.

Midwest cites *Tucker v. Capital City Riggers,* 437 N.E.2d 1048 (Ind.App.1982), in support of its position that Select's lien is invalid due to its failure to issue a receipt at the time of entrustment. Reviewing this case again, however, the court finds it to be distinguishable from the case at hand. In *Tucker,* the court considered whether the plaintiff was entitled to recover a forklift from the defendant-appellant, a mover of heavy machinery, which had moved the forklift from California to Indiana and claimed a lien on the forklift for moving and other unrelated costs. The court concluded that because the defendant-appellant held the forklift "hostage for unrelated debts," it in effect waived any lien which it may have held in the property. 437 N.E.2d at 1052.

In this case Select only claims to hold a lien in the debtor's embryos for debts related to the production and care of embryos. The issues of wrongful possession and possible waiver of lien are not before the court. In addition, discussion in *Tucker* concerning the mandatory construction of Ind.Code §§ 32–8–32–1 and 32–8–32–3 is inapplicable because the statute specifically states that in order "to acquire ... a lien upon ... [such] property ... [one] shall file ... notice...." 437 N.E.2d at 1051 (quoting Ind.Code § 32–8–32–2 (1976)). In our case the common law requires no notice for acquiring an artisan's lien. The court therefore finds that Select holds an artisan's lien in the debtor's embryos.

### 2. The priority of Select's interest in the embryos

■ Next, the court will consider the priority and extent of Select's lien as to other secured parties including Midwest which holds an alleged prior perfected security interest in the debtor's embryos and three super-priority liens against property of the debtor's estate. Generally, "[c]on-

---

10. Ind.Code § 32–8–30–4 states that "[t]he provisions of [Ind.Code § 32–8–30–1 et seq.] apply to all cases of personal property on which the bailee or keeper has, by law, a lien for any feed or care by him bestowed on such property;...." Ind.Code Ann. § 32–8–30–4 (Burns Supp.1989).

11. For example, an artisan's lienholder could continue to hold his bailor's property and initiate a state court action against the bailor to recover the debt for his services.

flicting security interests rank according to priority in time of filing or perfection." Ind.Code Ann. § 26–1–9–312 (Burns Supp. 1989). Ind.Code § 26–1–9–310, though, provides that certain liens have priority over perfected security interests. The section states:

When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

Ind.Code Ann. § 26–1–9–310 (Burns 1974). In this case Select held a perfected artisan's lien in the debtor's embryos which were in its possession from the moment the debtor failed to pay it for its services in producing and storing the embryos. Thus, even though Midwest may hold a security interest which was perfected prior to the time Select obtained its lien, under Indiana law the court finds that Select's lien is superior to Midwest's interest.

In the bankruptcy setting the court may in certain circumstances authorize the debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(d) (Callaghan 1989). In this case the court on three different occasions authorized the debtor to borrow money from Midwest and granted Midwest a super-priority lien against all property of the debtor's estate in order to allow the debtor to continue to feed its livestock and operate its business.[12] The court's intent in these orders was to insure that parties such as Select who were providing valuable services to the debtor's business were paid inasmuch as the debtor itself was experiencing a severe cash flow shortage and had no funds to continue its business. Unfortunately, contrary to the court's expectation, Select and others were not paid for their services. Hence, Select is involved in the Complaint before the court.

While the court's orders authorizing the debtor to borrow money from Midwest and granting Midwest super-priority liens pursuant to § 364(d)(1) provide Midwest with liens "on all property of the estate that is senior to any and all other liens now in existence on said property of the estate," the court determines that it would be fundamentally unfair to find that Midwest's liens are superior to Select's lien when Select obtained its lien prior to the time the court granted Midwest's super-priority liens and the court would not have permitted the debtor to borrow money from Midwest but for the need to pay for Select and others' services which enabled the debtor to continue operating. Reviewing the court's orders granting Midwest super-priority liens in light of the purpose thereof, the court thus determines that Select's artisan's lien is superior to the super-priority liens of Midwest. The court believes any other result would be unconscionable.

Inasmuch as the court's findings resolve the dispute concerning the priority of Select and Midwest's competing liens on the debtor's property, the court finds it unnecessary to address the issues of whether Midwest and Select hold perfected security interests in the debtor's embryos by virtue of their respective agreements with the debtor and the priority and extent of the alleged security interests.

### Conclusion

WHEREFORE, the court now determines that Select holds a valid artisan's lien in the debtor's embryos which is superior to Midwest's alleged prior perfected security interest and super-priority liens.

Pre-trial conference on the remaining issues to be determined with respect to Midwest's Complaint is now set for April 25, 1990, at 2:15 p.m. It is

SO ORDERED.

12. The court's orders granting authorization for the debtor to borrow money secured by a super-priority lien are dated May 26, 1987, July 24, 1987, and January 5, 1989.