**CHEMICAL BANK, Plaintiff,**

v.

**COMMUNICATIONS DATA SERVICES, INC., Defendant.**

Civ. No. 4–91–CV–70053.

United States District Court,
S.D. Iowa, C.D.

April 15, 1991.

Mark McCormick, Belin, Harris, Helmick & Tesdell, Des Moines, Iowa, Richard S. Toder, Zalkin, Robin & Goodman, New York City, for plaintiff.

Michael W. Thrall, Nyemaster Goode & McLaughlin, Des Moines, Iowa, for defendant.

## RULING AND ORDER DENYING PLAINTIFF'S PRELIMINARY INJUNCTION

VIETOR, Chief Judge.

This is a diversity of citizenship action for declaratory judgment by one creditor of the Mother Earth News Partners ("MEN") against another creditor of MEN that presents an issue of lien priorities. The property in question is MEN's master file of subscribers ("subscription list"). Plaintiff Chemical Bank ("Chemical") seeks a preliminary injunction against defendant Communications Data Services, Inc. ("CDS"), to stop CDS from foreclosing its purported artisan's lien on the subscription list by sale of the list.

On February 15, 1991, I issued a temporary restraining order prohibiting the sale by CDS of the subscription list pending hearing and ruling on Chemical's motion for preliminary injunction. The hearing was held on March 27, 1991.

## FINDINGS OF FACT

CDS is an Iowa corporation that entered into several subscription fulfillment agreements with MEN; the most recent agreement (as amended) is dated October 1, 1985. Pursuant to the agreements, CDS has had possession of MEN's subscription list in Iowa since 1979, and provided subscription fulfillment services to Mother Earth News Magazine from 1979 to December 31, 1990. The services CDS provided, according to the subscription fulfillment agreement, include caging (receiving orders), entering transactions (orders, payments, address changes, etc.), editing transactions, maintaining the master file, billing and accounts receivable, mailing regular renewal promotions and other promotions, printing mailing labels and sorting labels, keeping track of postal service forms and payments, providing lettershop services, answering correspondence, and completing several operating reports. The information CDS maintained for MEN includes the subscriber's name and address, any premium codes, and promotional and historical data. CDS also developed customized software programs for MEN (billing 570 program hours since 1987, according to John Meneough, CDS vice-president), which allowed MEN to extract the data it found useful. Under the terms of the subscription fulfillment agreement, CDS bills MEN the first week of each calendar month for services it performed in the preceding month. Payment is due on or before the 10th of the month following the month in which MEN receives the invoice. CDS performed all of its services for MEN in Iowa, and retains possession of the list in Iowa. The subscription fulfillment agreement states that the agreement "shall be construed under and governed by the laws of the State of New York."

On or about June 23, 1988, MEN and Chemical entered into a credit agreement and a security agreement pursuant to which Chemical made loans to MEN totaling $14,975,000. The security agreement states that MEN grants Chemical a first priority security interest in, among other things, all of MEN's "general intangibles,"[1] specifically including the subscription list. At the time of Chemical's loan to MEN, MEN paid CDS for services performed through April 1988, but not for services performed in May or June 1988. On or before June 30, 1988, Chemical duly filed Uniform Commercial Code financing statements with the secretaries of state and local filing offices in New York, Illinois, and North Carolina. The financing statements described Chemical's collateral as including the subscription list. Chemical did not file a financing statement in Iowa.

MEN is currently in default of its obligations to Chemical under the Credit Agreement in the outstanding principal amount of $14,975,000. The value of the subscription list is less than $14.9 million. MEN currently owes CDS $394,588.44 for

---

1. The parties dispute whether the subscription list is an "intangible" or a "good." The distinction may make a difference as to the proper place for MEN to have filed its financing statements. *See* Iowa Code § 554.9103(1), (3). That dispute need not be, and is not, resolved in this ruling.

fulfillment services performed, invoiced and billed monthly from September 1989 through December 31, 1990.

The last published issue of Mother Earth News Magazine was the November–December 1990 issue. Newsstand copies were sent out, but subscriber copies were not mailed. The magazine staff was laid off in late November or early December 1990.

Owen Lipstein, general partner of MEN, has been trying to market MEN since 1989, with only one prior serious negotiation which did not result in a sale. Lipstein has been conducting sale negotiations with the Japanese Independent Communications Company (JICC) since May 1990. At the time of this writing, JICC and Lipstein have not consummated a sale, but Lipstein testified that JICC has orally agreed to purchase MEN if certain terms and conditions are met, namely: (1) Chemical's acceptance of $5,750,000 in satisfaction of MEN's loan obligations; (2) settlement with state and federal taxing authorities regarding $1.7 million in tax liability; and (3) delivery of a balance sheet from unsecured creditors reducing the unsecured debt from over $10 million to approximately $3 million. JICC would also pay $500,000 cash in transaction fees. As of March 20, 1991, according to Lipstein, the settlement negotiations with the taxing authorities were still ongoing; vendors representing 4 percent of the total unsecured debt had agreed formally to the JICC terms; and nearly all of the 25 major vendors (representing about 75 percent of the total unsecured debt) had agreed in non-binding letters of intent. Chemical offered no testimony about these negotiations from JICC personnel or any of the vendors.

## CONCLUSIONS OF LAW

### Dataphase Standard

■ The following considerations, which the Eighth Circuit set out in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640

F.2d 109, 113 (8th Cir.1981), guide my determination regarding whether a preliminary injunction should issue: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; and (4) the public interest.

### Probability of Success

It is improbable that Chemical will succeed on the merits in this case for the reasons that follow. The following conclusions are, of course, tentative and it is possible, although I think not probable, that some of the conclusions that I will reach on the final decision in this case will differ.

■ First, I must consider the question of which state's lien law applies. CDS argues that New York's lien law applies because the agreement between CDS and MEN provides that the laws of the state of New York shall govern the agreement. This case, however, does not involve a contract dispute between CDS and MEN, but rather a dispute between creditors as to lien priority. The law which parties to a bailment contract select to govern their agreement does not control the question of which law applies to the validity and priority of an artisan's lien. *In re Stookey Holsteins, Inc.*, 112 B.R. 942, 948 n. 8 (Bankr. N.D.Ind.1990). An artisan's lien is governed by the law of the state in which the property is located and possessed. *See A.L.U. Textile Combining Corp. v. First Hartford Corp.*, 25 B.R. 563, 564 (Bankr.S. D.N.Y.1982), *aff'd*, 33 B.R. 126 (S.D.N.Y. 1983); 8 Am.Jur.2d, *Bailments* § 243. Because CDS possessed the subscription list and performed services on it in Iowa, and the list remains in Iowa, Iowa's lien law applies.

■ The second inquiry is whether CDS has an artisan's lien under Iowa law.[2] I

---

**2.** The somewhat novel issues of Iowa lien law presented in this case would better be decided by the Iowa Supreme Court. Because they are presented to this court, however, it becomes my

responsibility to "judicially 'estimate' what the Iowa Supreme Court would do if confronted with the same issue[s]. *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 209, 76 S.Ct. 273, 279, 100

conclude that it does. The Iowa artisan's lien statute provides:

> Any person who renders any service or furnishes any material in the making, repairing, improving, or enhancing the value of any inanimate personal property, with the assent of the owner, express or implied, shall have a lien thereon for the agreed or reasonable compensation for the service and material while such property is lawfully in the person's possession, which possession the person may retain until such compensation is paid, but such lien shall be subject to all prior liens of record, unless notice is given to all lien holders of record and written consent is obtained from all lien holders of record to the making, repairing, improving, or enhancing the value of any inanimate personal property and in this event the lien created under this section shall be prior to liens of record.

Iowa Code § 577.1. Chemical argues that the services CDS provided were merely clerical. I disagree. The services CDS performed for MEN involve taking raw data supplied from various sources, and transforming the data into a form CDS could use for a multitude of purposes for the benefit of MEN. By updating and maintaining the list, and by manipulating the data with customized software, CDS provided a current and valuable product to MEN. These services improved or enhanced the value of the list within the meaning of section 577.1. *See American Consumer, Inc. v. Anchor Computers, Inc.*, 93 Misc.2d 452, 453, 402 N.Y.S.2d 734 (Sup.Ct.N.Y.1978) (computer services performed on customer mailing list enhanced the value of the computer tapes, giving service provider artisan's lien under New York law). CDS also meets the other requirements of an artisan's lien: The owner of the list expressly assented to the services, the list is and has been in the lawful possession of CDS, and CDS has not re-

ceived the agreed upon compensation for all of the services it has performed for MEN.

■ The third issue is whose lien takes priority over the other. The Iowa Uniform Commercial Code states:

> When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

Iowa Code § 554.9310. The Iowa artisan's lien statute *does* expressly provide otherwise when the perfected security interest (or other lien) is a "prior lien of record." § 577.1.[3] Chemical's lien is a "prior lien of record" within the meaning of section 577.1 only if Chemical perfected its lien (i.e., filed appropriate financing statements under the UCC) before CDS performed services improving or enhancing the value of the subscription list. *See Municipal Equip. v. Butch & Son Deep Rock*, 185 N.W.2d 756, 759 (Iowa 1971) (lien on a car, perfected *before* the holder of an artisan's lien had possession of or performed services on the car, held superior under Iowa law). CDS obtained an artisan's lien on the subscription list in 1979 by taking possession of the list and performing services on it. *See id.* at 758. CDS, therefore, obtained its lien well before Chemical perfected its lien.

■ Chemical argues that it holds the prior lien because at the time it perfected its security interest in the list, MEN had fully paid the invoices that were outstanding, and payment for the services performed in May and June of 1988 was not yet due. An artisan's lien, however, arises on rendering the service, not on some later date when payment for the service falls

---

L.Ed. 199 (1956) (concurring opinion)." *Heeney v. Miner*, 421 F.2d 434, 439 (8th Cir.1970). The conclusions I reach represent my judicial "estimate" of what the Iowa Supreme Court would conclude on the same issues.

3. The parties dispute whether Chemical had to file a financing statement in Iowa (see footnote 1). I need not address that issue now, and for purposes of this ruling I assume without even tentatively deciding that Chemical did not have to file in Iowa.

due. CDS began providing services long before Chemical obtained its security interest, continued to constantly provide services after that intervening event, and at no time did MEN fully pay CDS for all the services it had rendered.

■ Chemical also argues that because CDS has now been paid for all services rendered before June 23, 1988, and the artisan's lien CDS currently asserts is security only for payment of services performed after that date, Chemical's lien is a prior lien. I do not agree. Once CDS's lien arose in 1979, it remained in effect by virtue of CDS's continuous possession of the list and continuous performance of services on it for MEN. Chemical's lien cannot meet the statutory requirement of being "prior" to CDS's lien, because Chemical did not perfect its lien before CDS began performing services on the list in its possession. Chemical's position that an intervening lien becomes a hybrid—subordinate to the artisan's lien for prior services but prior to the artisan's lien for subsequent services—finds no support in the language of the lien statute. Furthermore, such a construction of the lien statute would put an extremely unfair and highly burdensome obligation on the artisan, requiring that it constantly check the public lien records (in this case, in other states) to see if the property on which it is performing services has suddenly been mortgaged. On the other hand, the party lending money and taking a mortgage has only the minimal burden of checking the physical location of the property mortgaged to ascertain whether it is in the hands of an artisan. Because Chemical's lien is not a prior lien of record under Iowa law, it is subordinate to the lien of CDS.

### Irreparable Harm to Plaintiff

Chemical argues that the sale of the subscription list by CDS would drastically reduce the value of MEN as a going business for sale purposes, and thereby would cause irreparable harm to Chemical by decreasing the value of its collateral. Owen Lipstein, however, has been trying to sell MEN for nearly two years and has not yet succeeded. Lipstein currently has only one negotiation going, and that began almost a year ago. The evidence regarding the status of that negotiation indicates that the possibility of actually consummating a sale is extremely unlikely. Therefore, only a very slim chance of harm to Chemical exists if the preliminary injunction does not issue. Furthermore, Chemical can totally avoid even that slim chance of harm by buying the subscription list at CDS's foreclosure sale. By purchasing the subscription list, Chemical would keep open whatever possibility exists of a sale to JICC or another interested party, thereby precluding irreparable harm.

### State of Balance

The state of balance between possible harm to Chemical if the preliminary injunction is not issued, and the injury that granting the injunction will inflict on CDS if the injunction is wrongfully issued, weighs in favor of CDS. It is undisputed that the longer the sale of the subscription list is delayed, the less its value. That loss of value is a certainty, as compared to the highly speculative possibility of harm to Chemical if the injunction is not issued.

### Public Interest

The public interest factor does not weigh one way or the other in this matter, as best I can determine.

### Conclusion

Applying and weighing the four *Dataphase* factors for issuance of preliminary injunctive relief leads me to conclude that the preliminary injunction sought by Chemical should not be granted. The funds from any foreclosure sale of the subscription list should, however, be held in escrow pending the final decision in this case. The parties raise other arguments, but I need not decide those issues at the preliminary injunction stage.

### RULING AND ORDER

Plaintiff Chemical Bank's motion for a preliminary injunction is DENIED.

It is, however, ORDERED that if CDS conducts an artisan's lien foreclosure sale of the subscription list, it do so in a com-

mercially reasonable manner with full opportunity granted to Chemical to bid, and that the proceeds of any artisan's lien foreclosure sale be placed in an interest-bearing escrow account agreed to by the parties, to be held pending final decision in this case. If the parties cannot agree, the funds shall be paid to the clerk of court, who shall hold them in an interest-bearing account.

IT IS FURTHER ORDERED that the temporary restraining order previously issued is dissolved.