In re S.M. ACQUISITION CO., d/b/a
Stylemaster, Inc., Debtor.

American National Bank and Trust
Company of Chicago, Plaintiff,

v.

Matrix IV, Inc., Defendant.

Bankruptcy No. 02 B 10723.
Adversary No. 02 A 00283.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 4, 2003.

Mark L. Radtke, Esq.; Steven Towbin, Esq. (Shaw Gussis, Fishman, Glantz, Woflson & Tobin, LLC), for Movant or Plaintiff.

Richard S. Lauter, Esq.; George M. Sanders, Esq.; Sara E. Lorber, Esq. (Holland & Knights, LLC), for Respondent or Defendant.

Vance L. Liebman, Esq. (Funkhouser, Vegosen, Liebman & Dunn). Michael L. Gesas, Esq. (Gesas, Pilati, Gesas and Golin, Ltd.), trustee or Other Attorneys.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Plaintiff, American National Bank and Trust Company of Chicago ("American" or the "Bank"), sued Matrix IV, Inc. ("Matrix") in this Adversary proceeding, which is related to the Chapter 11 Bankruptcy of S.M. Acquisition Co. ("Stylemaster" or "Debtor"). American seeks a declaratory judgment that its lien against the Debtor is superior to Matrix's lien. American's lien derives from a perfected security interest covering "all" of the Debtor's property. However, Matrix argues that "all" was not intended to refer to molds in Matrix's possession, and asserts a lien on molds in its possession under the Illinois Tool and Die Act. It also asserts a common law artisan's lien for repairs made to those molds.

The parties cross moved for summary judgment, but both motions were earlier denied. Matrix also sought to plead an affirmative defense of equitable subordination, but that defense was stricken pursuant to the Bank's motion, for reasons earlier stated.

Following trial, closing arguments were submitted in writing. Based on submissions of the parties and the evidence adduced at trial, the court finds and concludes for reasons stated below that the Bank has a superior lien in all of the Debtor's assets, including the molds located at Matrix, and that Matrix failed to prove its artisan's lien claim.

The court now makes and enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### The Parties Stipulated to the Following Facts in ¶¶ 1–18

1. S.M. Acquisition Co. d/b/a Stylemaster, Inc. ("Stylemaster") was incorporated on May 6, 1994, for the purpose of manufacturing and distributing plastic storage containers. Stylemaster purchased and sold products made with plastic injection molds that were located at its own facilities and at the facilities of third-party processors, including Matrix.

2. On March 18, 2002, Stylemaster filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this court pursuant to 11 U.S.C. § 301. No trustee has been appointed to administer Stylemaster's estate. Stylemaster continues to administer its estate as Debtor in Possession within the meaning of 11 U.S.C. § 1101(1).

3. American is an Illinois National Banking Association. American's principal place of business is located at 120 South LaSalle Street, Chicago, Illinois 60603. American is a creditor of Stylemaster and has filed a claim against Stylemaster and certain of its property in the amount of $9,586,085.97. As of the petition date, Stylemaster owed American at least that amount.

4. Matrix was a vendor of Stylemaster that made plastic storage containers for Stylemaster and others, using injection molds. Matrix currently is in possession of 62 plastic injection molds owned by Stylemaster ("Molds"). Trial Exhibit 1 is a list of the molds Matrix received prior to November 3, 1997. Trial Exhibit 2 is a list of molds Matrix received after November 3, 1997.

5. In March 2002 Matrix filed a proof of secured claim under the Illinois Tool and Die Act ("Act") in the amount of $6,668,080.63. As of the petition date, Stylemaster owed Matrix at least that amount.

6. On November 3, 1997, American and Stylemaster entered into a loan agreement (the "Loan Agreement"). Trial Exhibit 1 is a true and complete copy of the Loan Agreement.

7. American and Stylemaster also entered into a security agreement on November 3, 1997 (the "Security Agreement"). Trial Exhibit 2 is a true and complete copy of the Security Agreement.

8. From time to time thereafter, the Loan Agreement and related documents ("Loan Documents") were amended.

9. On November 30, 2001, American and Stylemaster entered into the "Seventh Amendment to Loan Documents."

10. American filed with the Illinois Secretary of State a Uniform Commercial Code financing statement (the "Financing Statement") on November 6, 1997, as Document No. 3760504. Trial Exhibit 3 is a true and complete copy of the Financing Statement.

11. At all times after November 6, 1997, Stylemaster was obligated to American under the Loan Documents.

12. Stylemaster used Matrix as an outside processor from November 1994. Stylemaster and Matrix continued their business relationship until shortly before Stylemaster filed its petition for Chapter 11 relief in this court.

13. As of November 6, 1997, Stylemaster owed Matrix approximately $2,400,000. But by the end of December 1999, Stylemaster had fully satisfied its pre-November 6, 1997, debt to Matrix.

14. As of the Petition Date, Stylemaster had paid all open invoices dated prior to July 25, 2001.

15. On June 5, 1995, counsel for Matrix sent a letter to Martha Williams in which Matrix notified Stylemaster that it was asserting a tool and die lien on the Stylemaster molds in its possession pursuant to the Illinois Tool and Die Lien Act, 770 ILCS 105/1 et seq. ("Act")

16. On July 30, 1996, counsel for Matrix sent a letter to Martha Williams in which Matrix notified Stylemaster that it was asserting a tool and die lien on the Stylemaster molds in its possession pursuant to the Act.

17. On February 22, 2002, Matrix filed a Verified Complaint in the Circuit Court of the 19th Judicial Circuit, McHenry County, Illinois naming Stylemaster and Martha Williams as defendants.

18. Raymond C. Wenk, Sr. ("Wenk"), President of Matrix, executed a Verification by Certification pursuant to Section 1–109 of the Illinois Code of Civil Procedure certifying to the truthfulness and correctness of the statements set forth in the Verified Complaint.

### Matrix's Repair of Stylemaster Molds

19. In 1994, Matrix received two sets of molds from Stylemaster, consisting of bases and lids for the 40" under bed storage container. Both sets of molds had been in production at another facility prior to coming to Matrix, and Matrix had to repair the molds before they could be used in production. Wenk Tr. at 13–14; Def.'s Ex. 63 and 64.[1]

20. These repairs were different from normal or routine preventive maintenance, for which Matrix did not charge Stylemas-

ter. Preventive maintenance consisted of cleaning, polishing, and greasing a tool so that the tool was kept in good working order. See Roy Wenk Tr. at 38–39, 41.

21. Matrix obtained approval from Stylemaster before commencing the repairs, and the cost of the repairs was invoiced to Stylemaster, which paid the invoices. See Defendant's Exhibit 63(c) Max 03517–03518.[2] This practice was consistent with Matrix's policy of obtaining approval from its customer before undertaking any repair on the customer's mold. See Wenk Tr. at 67.

22. In mid–1995, Matrix agreed to advance the money that Stylemaster owed two of its other molders, "CMA" and "Abel." See Wenk Tr. at 55–56. CMA and Abel delivered Stylemaster molds they had been using in their production for Stylemaster to Matrix after it paid the outstanding balances owed to those firms. Thus, the production formerly done at CMA and Abel was shifted to Matrix. Stylemaster eventually made good on its promise to repay the money advanced by Matrix. Martha Williams Tr. at 40.

23. Wenk testified that it was during mid 1995 that Martha Williams ("Williams"), President of Stylemaster, asked him if he would agree to defer the cost of repairs made by Matrix to Stylemaster molds. Under the purported agreement, Matrix was to have complete control over Stylemaster molds in its possession until Stylemaster paid all outstanding repair bills; the molds would be treated like they were owned by Matrix; and Stylemaster could not remove any of the molds until the repair bills were paid in full. Matrix in turn would record the ac-

---

1. "Tr." refers to trial transcript pages of the witness referred to. "Def. Ex." or "Pl.Ex." refers to Plaintiff and Defendant exhibits admitted into evidence.

2. Reference to "Max" or other acronyms is to page numbers of a referenced exhibit.

cumulated repair cost. Wenk Tr. at 70–71, 75, 76, 86, 165. The purported agreement to defer repair cost was never documented. Nor did the parties exchange any documentation related to that purported agreement during the ensuing seven years. For reasons discussed at length below, the court finds that this testimony is not credible.

24. In 1996, Matrix and Stylemaster entered into an agreement whereby Matrix would include the cost of minor repairs in the "piece-part-rate" charged to Stylemaster. *Id.* at 32. The piece-part-rate was the unit price charged by Matrix for each item produced for Stylemaster. Wenk Tr. at 32–33. The agreement with Matrix enabled Stylemaster to capture all of its production cost in the piece-part-rate, which meant that it could better price its products. *Id.* at 97. As a result of this agreement, Stylemaster paid Matrix a higher piecepart-rate than it paid its other molders. *Id.* at 32. However, notwithstanding that agreement between the parties, any extraordinary repairs were to continue to be paid by Stylemaster, subject to the requirement that such repairs had to be pre-approved by a principal at Stylemaster. *Id.* at 34.

25. Stylemaster has paid all such repair bills invoiced by Matrix. Wenk Tr. at 200 and January 21, 2003, Tr. at 37.

*Mold Set-up Charges*

26. Each mold must be "set-up" before it can be used in production. Williams Tr. at 41. This includes making adjustments to make sure that the mold is functioning properly and that it can meet the demands of a full production run.

27. Prior to this litigation, Matrix never billed Stylemaster for the set-up costs associated with any of the molds in its possession *Id.*, nor did Matrix keep any records documenting these costs. *See* Direct Testimony of John Wenzlaff January 23, 2003.

28. Matrix now seeks $108,950.00 in payment for set-ups to Stylemaster molds. *See* Def's Ex. 132A (Revised). These purported costs were not documented contemporaneously, so Matrix had to determine the amount to bill for set-ups in 2002 in preparation for this lawsuit. The set-up costs computed in preparation for trial were derived by a Matrix employee, John Wenzlaff ("Wenzlaff"), who reviewed the Tool Room Profiles kept at Matrix. The Tool Room Profiles were generated from tool room employee time slips which are fed into Matrix's billing system to create a Tool Room Profile. By looking at the Tool Room Profiles for the last seven years, Wenzlaff attempted to determine whether a set-up would have been necessary for a given repair. Similarly, Wenzlaff determined whether cleaning and polishing a mold was related to a repair or whether the work was routine maintenance by looking at Tool Room Profiles and time sheets for the past seven years. *See* Def.'s Ex. 63(c) at MAX 03341. He also looked at each Tool Room Profile and determined what was routine maintenance, for which Stylemaster should not have been charged, and what was an actual repair, to validate the $465,518.03 in repair cost now sought by Matrix. Def.'s Ex. 132A (Revised).

29. Wenzlaff testified that Matrix kept a production book for each tool, which documented the processing work done on that tool, including any related set-up. However, Matrix did not produce any production books at trial.

30. The Tool Room Profiles for 1994–1996 were not created until this litigation began in 2002. Loretta Lane Tr. at 12–13. Of the $465,518.03 in repair charges now sought by Matrix, more than $70,000 is not even supported by any time slip. Matrix only produced the tool logs to substantiate

these charges. See Def.'s Reply to Bank's Ex. A; Def.'s Exs. 63–123. But the tool logs only show the date, job number, and a brief description of the work performed on a particular mold. There is no information there on the amount of time spent working on a particular tool. *Id.*

31. The Exhibits submitted by Matrix contain more than $4,000 in duplicate billings or charges assigned to the wrong mold. *Id.*

32. There are more than $3,500 in charges related to third-party invoices that do not specify any Stylemaster mold. *Id.*

33. Matrix now seeks $139,655 (or 30% of repair cost) as profit for repairs allegedly made to Stylemaster molds. Def.'s Ex. 132A (Revised). Matrix has not presented any evidence that Stylemaster agreed to, or was aware of, this requested profit margin. Instead, the profit margin was derived by Matrix's CEO, Roy Wenk, who based the 30% profit margin on what he thought would be fair. Wenk Tr. at 135.

34. Matrix never kept a running tally of any of the charges related to its asserted artisan's lien, nor did it include any receivables for its lien in its financial reports. It never issued invoices related to the repair costs now asserted to apply to its lien, and Wenk testified that he never spoke to Williams about any specific amount Stylemaster owed to Matrix for repairs. Wenk Tr. at 149, 162, 165.

### Debugging Charges

35. In 1998, Matrix received new molds that were purchased by Stylemaster and shipped directly to Matrix's plant from the manufacturer in Portugal. Once at Matrix, the molds had to be "debugged" before they could be put into production. This meant that they had to be set-up, tested by running sample products, and modified and/or repaired to make sure that the tool could produce acceptable products.

The debugging process enabled Stylemaster to determine the production cost for each part, which was used to derive the wholesale price charged to its customers. Wenk Tr. at 95, 99–100. Typically, the seller of a new mold is liable for any repair cost during the debugging phase.

36. Stylemaster purchased some new molds from a company named Cost Reduction. According to Wenk, he had an agreement with Williams to defer the debugging cost on all molds until Stylemaster reached a settlement with Cost Reductions. Wenk Tr. at 158. Wenk said that this agreement was formed in 1998 and that year after year he would defer billing for all debugging cost. *Id.* Indeed, Wenk testified that Matrix did not receive "ten cents" for debugging Stylemaster molds, including the so-called "monster mold," part number WB 8015. Wenk Tr. at 104. However, on cross-examination he admitted that Cost Reductions paid Matrix for debugging molds sold by it to Stylemaster, and that Matrix received over $8,000 for work on the "monster mold." Wenk also admitted that Cost Reductions paid Matrix most of the $80,000 billed to Cost Reductions for debugging molds. Pl.Ex. 4.

37. The court finds that cost of debugging Stylemaster molds supplied by Cost Reductions was borne by Cost Reductions.

### The Loan From American to Stylemaster

38. On November 3, 1997, American and Stylemaster executed a loan agreement (the "Loan Agreement"). Under the Loan Agreement, the Bank agreed to lend up to $2 million, with the amount available being equal to 80% of eligible receivables plus 25% of eligible inventory. The loan was secured by ". . . all Accounts, Inventory, Equipment owned by [Stylemaster] as of the date hereof . . . and any and all other assets and property of [Stylemaster], wherever located . . ." Def.'s Ex.5 at 01324 (Emphasis supplied). Computations of

"Eligible Inventory" were restricted to inventory that is verified in "certifications or other appropriate evidence" including, a "Schedule of Inventory reflecting Inventory owned by Borrower and in Borrower's possession." Def.'s Ex. 5 ¶¶ 4.5, 4.15 at 01325,01328. The Loan Agreement was negotiated by William Bailes ("Bailes"), an officer and co-owner of Stylemaster, and William Provan ("Provan") on behalf of American. Bailes Tr. at 11–12. Bailes and his partner acquired a 49% stake in Stylemaster in 1997. Def.'s Ex. 133.

39. Obtaining a line of credit for Stylemaster, which had failed in previous attempts to obtain financing, was a condition subsequent to Bailes' September 1997 acquisition of Stylemaster common shares of stock. *Id.* at MW04110.

40. Bailes tried to help Stylemaster obtain a loan. He prepared and submitted a loan application to the Bank on Stylemaster's behalf. Stylemaster's presentation to the Bank sought "a revolving credit facility ... based on 80% of qualified receivables ... plus 50% on inventory." Dated October 4, 1997, it also noted that Stylemaster's molding, or processing was then done by outside third-party suppliers who possessed and utilized Stylemaster's molds. Def.'s Ex. 143 at 00642.

41. Stylemaster's credit presentation also notes that: (a) Matrix was one of its molders and that Matrix had an agreement with Stylemaster whereby it directly billed Target (one of Stylemaster's customers); (b) matters related to mold ownership and payment for recently produced molds would be dealt with through written agreements; (c) those agreements would be on terms favorable to Stylemaster; and (d) Stylemaster owed a Special Accounts Payable to Matrix, which would be reduced by half through a direct billing arrangement between Target and Matrix. Def.'s Ex. 143.

42. The Stylemaster credit presentation did not otherwise specifically identify or describe any Stylemaster mold then located at any third-party molding facility, including Matrix's Woodstock Illinois facility, or include any valuation of any mold. Def. Ex. 143.

43. Bailes testified that Matrix's need and right to direct payments from Target were extensively discussed with the Bank, because this arrangement had a direct and negative impact upon the borrowing base upon which Stylemaster could obtain credit advances. Bailes Tr. at 14–17.

44. Bailes and Stylemaster's attorney, David Kendall, were the two persons who directly negotiated the Stylemaster line of credit with the Bank. Bailes Tr. at 12.

45. American and Stylemaster also executed a Security Agreement on the same day that the Loan Agreement was executed, which provided in relevant part:

> [The] Borrower [Stylemaster] ... hereby grants to Bank a security interest in ... all of the Borrower's tangible and intangible assets and property, whether now or hereafter existing and whether now or hereafter owned ... including, without limitation, all of Borrower's (a)accounts ... [and] (c) goods, including, without limitation, all of Borrower's ... equipment ... and inventory.

Def.'s Ex. 5 at 01352. Section 4.9 and 4.10 of the Loan Agreement adopted the UCC definitions of equipment and inventory, respectively. Def.'s Ex. 5 at 01328. Hence, the Security Agreement of November 3, 1997, defines the Secured Collateral as all of Stylemaster's property. *Id* at 10352.

46. Multiple other paragraphs within this Security Agreement provided various obligations upon Stylemaster and granted the Bank various rights, all of which related directly and exclusively to the same Secured Collateral defined in this Security

Agreement. Def.'s. Exs. 5, ¶¶ 1–15, 01353–01356.

47. Stylemaster warranted that the collateral securing the loan was located at four locations:

1) Stylemaster's Chicago headquarters;

2) Paramount Plastics in Lockport, Illinois;

3) A Public Warehouse in Bedford Park Illinois; and

4) HPM Chicago located in Chicago, Illinois

Def.'s Ex. 5 at 01331.

48. The Security Agreement incorporated this representation of where the collateral was located. Def.'s Ex. 5 at 01353. Further, Stylemaster promised that the collateral would only be kept at these locations. *Id.* The Security Agreement also required Stylemaster to promise not to encumber any of the collateral and to make all repairs needed to maintain its value. *Id.* at 01353–54. Stylemaster's obligations to maintain and repair the Secured Collateral defined in the Security Agreement including specifically all of its secured "equipment" is expressly reaffirmed in the contemporaneous November 3, 1997, Loan Agreement. Def.'s Ex. 5 ¶ 7.2 at 01333.

49. Specifically, paragraph 7.2 of the 1997 Loan Agreement reaffirmed Stylemaster's agreement memorialized in paragraph 2 of the Security Agreement to locate and maintain all of the Secured Collateral at the same four locations identified in the 1997 Security Agreement. Again, these four locations include Stylemaster's facilities in Chicago and, for example, the Paramount Plastics facility in Lockport, Illinois. *Id.*

50. The facilities and addresses specifically identified in the 1997 Security Agreement did not include Matrix or its Wood-stock, Illinois facility, and Matrix and its Woodstock address is otherwise not addressed anywhere else in this Security Agreement.

51. On October 23, 1997, the Bank's attorneys forwarded a draft of the November 3, 1997, Loan Agreement to Kendall, then the attorney for Stylemaster and Bailes. Paragraph 5.13 of that draft notes that "all collateral is currently located and maintained at 1330 W. 43rd Street, Chicago, Illinois 60609 (borrower's principal place of business) and has been located at such location for the four (4) month period ending as of the date hereof." Def.'s Ex. 14 ¶ 5.13 at 10.

52. Paragraph 5.13 of the final version of the Loan Agreement executed on November 3, 1997, provided that all of the secured collateral is located exclusively at four (4) distinct locations including Paramount Plastics' Lockport, Illinois facility. Matrix's facility in Woodstock, Illinois is not identified in paragraph 5.13 of the final 1997 Loan Agreement. Def.'s Ex. 5 at 10.

53. At all material times during October and November 1997 when ¶ 5.13 was modified and expanded to include three (3) additional locations, Paramount Plastics had Stylemaster molds at its facility in Lockport, Illinois. Williams presented a letter at closing wherein she stated that certain finished goods held at Paramount Plastics would not be included in the inventory borrowing base. The excluded goods were products that had not been paid for by Stylemaster. Def.'s Ex. 5 at 01613.

54. Provan testified that the preliminary draft of the Loan Agreement, dated October 23, 1997, had to be modified to add three new locations that Stylemaster or its attorney said had Stylemaster molds. Hence, the final draft of the Loan Agreement, executed on November 3, 1997, in-

cluded these sites in the locator clause. Provan Tr. at 87–89.

55. Messrs. Bailes and Provan each testified that the Bank had actual knowledge of the Stylemaster accounts payable due Matrix and the direct billing arrangement Stylemaster had granted Matrix. Provan Tr. at 9, 28; Bailes Tr. at 14–15. Bailes testified that the Bank knew that Stylemaster molds were located at Matrix's Woodstock, Illinois facility, but Provan could not recall whether he knew Matrix had Stylemaster molds. Bailes Tr. at 39; Provan Tr. at 6, 8.

56. At all times mentioned here, the Bank's policy and practice was to use reasonable efforts to identify non-UCC based liens, including non-recorded possessory liens. This policy was not waived or relaxed in connection with the preparation of the 1997 Loan Documents. Pursuant to this policy and in connection with its provision of credit in November 1997 to Stylemaster, the Bank identified and obtained a waiver of a non-UCC based warehouse lien held by Stylemaster's landlord. Def.'s Ex. 5 at 01621.

57. Provan specifically testified that it was the Bank's policy to use reasonable efforts to identify, quantify and typically (but not always) to make sure such liens are "cleaned up" prior to closing a loan. Provan Tr. at 52, 61. Provan further testified that the Bank did in fact use reasonable efforts to identify all such possessory liens in connection with its November 1997 loan to Stylemaster. Provan Tr. at 65. Provan also testified that he had no knowledge of the lien asserted by Matrix on Stylemaster property. Provan Tr. at 8.

58. Both Provan and Bailes testified that it was their intention for the Bank to have a blanket lien on all of Stylemaster's property. Provan Tr. at 76, 80; Bailes at 33. No one at the Bank ever asked Matrix if it was asserting a possessory lien on the molds in its possession, either before or after closing. Bank's Rebuttal at ¶ 135.

59. Matrix called Alan Shapiro ("Shapiro"), an attorney and bank officer, to testify about bank practices for making secured loans. A *Daubert* hearing was held to determine if he qualified as an expert witness. The court held that Shapiro did not qualify as an expert witness because his opinions were not based on a methodized analysis of the banking industry; rather, he was merely discussing his own experiences as a bank officer. Thus, Shapiro was only allowed to testify as a non-expert witness. Shapiro Tr. at 16.

60. Shapiro testified that in his experience, banks will generally investigate situations where a debtor's property is possessed by a third-party to determine whether or not the property being offered as collateral is in fact available to serve as secured collateral for an intended loan. Shapiro Tr. at 17.

61. Shapiro further testified that a recognized exception to such due diligence investigations is where the bank intentionally fails to conduct an investigation in order to avoid disruption to a significant business relationship with a debtor's sole or critical source supplier, such as the relationship between Matrix and Stylemaster as of November 1997. Shapiro Tr. at 20–21. Shapiro stated that when a bank forgoes investigating under such circumstances, it consciously assumes the risk that its security interests might be inferior to the third-party supplier where the risk of the bank losing its first lien position are outweighed by the potential harm to the borrower if its source of supplies is disrupted. Shapiro Tr. at 21.

62. The November 1997 closing of the loan to Stylemaster was initially contingent upon the Bank's receipt of a "letter from Vance Liebman explaining law-

suits/encumbrances identified in Schedule 3.6 of Stock Purchase Agreement dated September 17, 1997," which allowed Bailes and his partner to purchase 49% of Stylemaster's stock. Def.'s Ex. 5 p. 2; Liebman Tr. at 128. Liebman is an attorney who has represented Williams and Stylemaster.

63. The Bank perfected its security interest by filing a UCC–1 form with the Illinois Secretary of State on November 6, 1997. The collateral description on that form made clear that the Bank asserted a security interest in all of the Debtor's then existing assets and any afteracquired property. See Joint Trial Exhibit 3.

64. The loan documents were modified several times as the Debtor slid toward bankruptcy. On November 30, 2001, the parties agreed to the Seventh Amendment To the Loan Documents wherein the fourth recital in the Security Agreement was substituted, in relevant part, by the following language "Borrower, ... hereby grants the Bank a security interest in ... Borrower's tangible and intangible assets and property **wherever** located...." See Joint Trial Exhibit 18 (emphasis added).

65. Bailes testified that Provan told him that the changes to the Security Agreement were needed to bring the document into compliance with the UCC. He further testified that the changes were not intended to expand the scope of the Bank's security interest, because he believed that the Bank already had a blanket lien on all of Stylemaster's property. See Bailes Tr. at 33.

66. By the end of December 1999, Stylemaster had paid $2.4 million that it owed Matrix for processing work done as of November 3, 1997. However, Stylemaster continued to owe Matrix for work performed after that date, which is the subject of the claim filed in this case.

67. American has filed a claim against the Debtor for $9,586,085.97.

68. Of the sixty-two molds in Matrix's possession that are owned by Stylemaster, all but fifteen were delivered to Matrix prior to November 6, 1997, the date the Bank perfected its security interest in "all" of Stylemaster's assets. Def.'s Ex. 132A (Revised).

### Miscellaneous

69. Fact statements contained in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### American Has a Lien in all of Stylemaster's Property

Matrix contends that Stylemaster lacked "full rights in the collateral including title." Post Trial Findings of Fact and Conclusions of Law Proposed by Defendant Matrix IV ¶ 178. Therefore, it argues that Stylemaster could not give a security interest in the molds to the Bank. Alternatively, Matrix asserts that even if the Bank had a legitimate security interest in Stylemaster molds, that interest did not include the molds at Matrix, but was limited to collateral particularly identified in the Loan Agreement. Each of these arguments will be discussed in turn.

Preliminarily, revised Ill. UCC Article 9, which went into effect July 1, 2001, applies here even though the events under review occurred prior to that date. The revised Article 9 applies to all security interests "even if the transaction or lien was entered into or created before [the statute's] effective date[.]" 810 ILCS 5/9–702.

■ Three requirements must be met to create an enforceable security interest under Illinois law: (1) value has been given by the creditor; (2) the debtor has rights in the collateral or the power to transfer

rights in the collateral to a secured party; and (3) either the debtor has executed a security agreement describing the collateral, or the collateral is not a certificated security and it is in possession of the secured party pursuant to the security agreement. 810 ILCS 5/9–203.

Matrix relies on the fact that both Wenk and Williams testified that certain new molds purchased from Cost Reductions were shipped directly to Matrix for testing, and that those molds were not deemed "accepted" until after they were fully debugged. Therefore, Matrix asserts that Stylemaster could not give a security interest in molds purchased from Cost Reductions prior to their acceptance, because it did not have "rights in the collateral," as required by the second element of the test for creating an enforceable security interest.

The revised Code does not define the term "rights in the collateral," just as its predecessor did not. However, cases interpreting the earlier version of the Code established three criteria for a debtor to possess sufficient rights in the collateral: (1) the debtor has possession and title to the goods; (2) the true owner consents to the debtor's use of the collateral as security; or (3) the true owner is estopped from denying a security interest. *Midwest Decks, Inc. v. Butler and Baretz Acquisitions, Inc.*, 272 Ill.App.3d 370, 208 Ill.Dec. 455, 649 N.E.2d 511, 516 (1995).

Matrix's argument is curious, since it is contradicted by the fact that Matrix has asserted its Tool and Die Lien against Stylemaster, and not Cost Reductions. The express language of the Act states that the lien runs in favor of an artisan to secure payment for work performed on property "belonging to a customer." 770 ILCS 105/1. The necessary implication of Matrix's argument is that the molds purchased from Cost Reduction were owned by it, and not Stylemaster. But if Cost Reductions is the owner of the molds, then Matrix's lien would lie against it, not Stylemaster. However, putting aside that inconsistency, Matrix's argument is without merit. The acceptance that Matrix refers to appears to be nothing more than an industry practice that determines when the cost of repair and debugging of a new mold shifts from the seller to the buyer. There is no evidence that it means anything else. Stylemaster appears to have had complete control over the molds in question, deciding where they should be shipped and how they would be used in production. There is no evidence that Stylemaster was prohibited from using the molds as collateral or that Cost Reductions had any input with regard to the disposition of the molds, other than approval of repair cost that it was required to pay during the debugging phase. Thus, Stylemaster exercised ownership rights in the collateral.

■ Matrix's next argument is at war with itself. On the one hand it correctly asserts that "Illinois law provides that the scope of the Bank's Security Agreement is determined by the November 1997 Security Agreement, and not the contemporaneous Loan Agreement." citing *In re Martin Grinding & Machine Works*, 42 B.R. 888, 891 (Bankr.N.D.Ill.1984); *Allis–Chalmers Corp. v. Staggs*, 117 Ill.App.3d 428, 72 Ill.Dec. 840, 453 N.E.2d 145, 148 (1983). Post Trial Findings of Fact and Conclusions of Law proposed by Defendant Matrix at ¶ 194–196. Quoting further, "Stylemaster's covenant in paragraph 7.2 of the 1997 Loan Agreement, for example, is no more than a promise to keep the Secured Collateral at the four locations identified in that paragraph and, as such, this promise does not identify or define the scope of the Bank's security interest." citing *In re Little Brick Shirthouse*, 347 F.Supp. 827

(N.D.Ill.1972). *Id.* at ¶ 197. On the other hand, Matrix argues that Section 5.13 of the Loan Agreement limits the scope of the security agreement: "[the] Loan Agreement unequivocally represents that ... all Secured Collateral was located at the four (4) locations specifically identified within ... paragraph 5.13." *Id.* at ¶ 199. Matrix relies on several cases that are inapposite the present case. Four of the cases cited by Matrix involve instances where the grant in the security agreement described the collateral as goods at a particular location. *See Charger Boats v. Tepper Industries, Inc.,* 74 B.R. 713 (9th Cir. BAP 1987); *First National Bank of Glasgow v. First Security Bank of Montana,* 222 Mont. 118, 721 P.2d 1270, 1273 (1986); *In re Freeman,* 33 B.R. 234 (Bankr.C.D.Cal.1983); *Matter of California Pump & Mfg. Co., Inc.,* 588 F.2d 717 (9th Cir.1978). For example, in *California Pump,* the security agreement described the collateral securing the loan as: "All of the furniture, fixtures, leasehold improvements, inventory, and account receivables ... located at: California Pump & Manufacturing Co., Inc." *California Pump,* 588 F.2d at 719. These cases are obviously distinguishable from the present case where the Security Agreement did not contain any such limitation:

> [The] Borrower [Stylemaster] ... hereby grants to Bank a security interest in ... all of the Borrower's tangible and intangible assets and property, whether now or hereafter existing and whether now or hereafter owned ... including, without limitation, all of Borrower's (a) accounts ... [and] (c) goods, including, without limitation, all of Borrower's ... equipment ... and inventory. Def.'s Ex. 5 at 01352.

■ Likewise, the final case cited by Matrix is unavailing because it simply stands for the unremarkable proposition that a debtor cannot defeat a perfected security interests by moving the collateral without the creditor's consent. *See In re Granny Frannies, Inc.,* 39 B.R. 377 (Bankr.D.S.C.1984).

■ Here, the plain language of the Security Agreement unambiguously gave the Bank a security interest in "all" of Stylemaster's then existing and after acquired property without reference to any specific location. Moreover, words are defined by the company they keep. *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The portion of the Security Agreement that specifies the location of the collateral is paragraph 2 under a heading which states "It is hereby understood and agreed by Borrower as follows" this section contains a number of covenants made by Stylemaster. For instance, Stylemaster agreed to limit its use of the collateral (¶ 1), to maintain the collateral (¶ 4), to pay any taxes owed on the collateral (¶ 3), and to insure the collateral (¶ 5). Def.'s Ex. 5 at 01353–54. Thus, Section 5.13 of the Security Agreement is nothing more than Stylemaster's promise to keep the collateral at certain designated locations. An express provision of the contract, giving the Bank a blanket lien in all of Stylemaster's assets, cannot be altered by Stylemaster's promises regarding the treatment of collateral.

### The Weight of Parol Evidence did not Support the Matrix Case

■ The parol evidence rule provides that evidence of prior or contemporaneous agreements or negotiations may not be introduced to contradict the terms of a partially or completely integrated contract. *Merk v. Jewel Food Stores Div. Of Jewel Companies, Inc.,* 945 F.2d 889, 892 (7th Cir.1991). Whether a contract is fully integrated is a question to be resolved by the court as a matter of law. *Id.* at 894.

A fully integrated, unambiguous contract cannot be altered by extrinsic evidence. *LaSalle National Bank v. General Mills Restaurant Group, Inc.*, 854 F.2d 1050, 1051 (7th Cir.1988). Rather, the court's duty is to look to words of the contract to determine intent of the parties thereto. *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1335 (7th Cir.1988) (citing *Rakowski v. Lucente*, 104 Ill.2d 317, 84 Ill.Dec. 654, 472 N.E.2d 791 (1984)).

 However, in this Circuit the foregoing statement as to the parol evidence rule only applies to parties to the contract. *Kaplan v. Shure Brothers, Inc.*, 266 F.3d 598, 606 (7th Cir.2001). Also under the Illinois rule, parol evidence is admissible to contradict or vary the terms of a written agreement where one litigant was a stranger to the contract and is in dispute with a party to the instrument. *General Casualty Company of Wisconsin v. Elam*, 8 Ill.App.3d 215, 289 N.E.2d 699, 705 (1972). This exception had its origin in insurance law where courts were called upon to determine whether a release signed by an injured party extended to a third-party tortfeasor. 13 A.L.R.3d § 2a. Although this exception to the parol evidence rule for strangers to a contract has been criticized by several commentators, it has survived. 13 A.L.R.3d 313, 1967 WL 15664 § 2c (noting criticism from Wigmore, Corbin, and Williston). Authority in this Circuit remains firm in holding that the third-party exception to the parol evidence rule applies even if the contract under consideration is free from ambiguity. *Deckard v. General Motors Corp.*, 307 F.3d 556, 564 (7th Cir.2002) (applying Indiana law); *Kaplan*, 266 F.3d at 606.

Given the foregoing authority, the court rejected the Bank's argument that Matrix should be barred from introducing extrinsic evidence to show that the Bank did not intend to take a security interest in the molds possessed by Matrix.

 Of course, the evidence started with the security instrument providing the Bank with liens on "all" of Stylemaster's property. Both parties then introduced evidence in an effort to show whether or not "all" included the molds in issue here.

Matrix attempted to show that the Bank was aware of its lien when it lent to Stylemaster, and that the Bank made a conscious decision to exclude the molds at Matrix from its security. Matrix sought to introduce expert testimony through Shapiro (Finding at ¶ 59) to show that the Bank deviated from common industry practice by failing to determine through due diligence whether Matrix had a common law lien on the molds in its possession. The court determined at a *Daubert* hearing that Shapiro did not qualify as an expert because he had not done any analysis of the industry as a whole, and he had no knowledge of the Bank's loan approval process. But Shapiro was allowed to give his lay opinion based on his experience as a bank officer. He testified that it was a common practice for a bank to exclude certain critical suppliers from its due diligence review if there was a possibility that such an investigation might upset the relationship between the vendor and the loan applicant.

Provan (Finding at ¶ 38) testified that the Bank had a practice of trying to identify and "clean up" any preexisting liens prior to making a loan, and that the Bank had used reasonable methods to identify any outstanding liens prior to lending to Stylemaster. He also acknowledged having been aware of the relationship between Stylemaster and Matrix, but could not recall whether he then knew that Matrix possessed molds belonging to Stylemaster. He said he did not know that Matrix was asserting a lien on Stylemaster molds

when the Bank agreed to make the loan to Stylemaster. Bailes (Finding at ¶ 38) testified that Provan knew that some Stylemaster molds were located at Matrix's plant. It appears that the Bank never learned when it made the loan of any claim by Matrix that it was asserting a lien against Stylemaster molds, but of course Matrix did not record any such claim of lien so as to give notice.

Matrix points to several factors to support its argument that the Bank actually intended to exclude the molds held by Matrix from its security: (1) Matrix was not identified in the "locator clause" in the Loan Agreement or in the Security Agreement; (2) the initial Loan Agreement was contingent upon Liebman (Finding at ¶ 62) delivering a letter to the Bank at closing showing that all liens and encumbrances had been cleared, yet such a letter was not included in the closing documents; (3) the Bank was aware that Stylemaster owed a significant amount of money to Matrix, and that payments from Target were being collected by Matrix to offset that debt; and (4) the Bank did not contact Matrix to inquire about whether it asserted a lien on Stylemaster molds.

For its part, the Bank relied on the testimony of parties who negotiated the contract between the Bank and Stylemaster, Messrs. Bailes and Provan, both of whom testified that they intended for the Bank to have a blanket lien in all of Stylemaster's property wherever located.

Having considered and weighed the testimony of all witnesses and the documentary evidence adduced at trial, it must be found and concluded that the Bank intended to take a blanket lien in "all" Stylemaster's property, including the molds located at Matrix or anywhere else. At best, Matrix has proven that the Bank did not interview at Matrix in order to investigate the relationship between Matrix and Stylemaster. But this is insufficient to establish that the Bank intended to exclude the molds at Matrix from its lien. Testimony elicited at trial and the weight of evidence showed that the only reason Matrix was not included in the "locator clause" is because the molds at Matrix were not computed as part of the borrowing base for the revolving loan. Moreover, the fact that the Bank knew that Stylemaster owed a significant sum to Matrix proves little, since the Bank was assured by Bailes that the loan would help Stylemaster to pay that debt. Lastly, the failure to include certain documents relating to prior liens in the closing book does not show intent to restrict the Bank's lien claim. If the parties had intended to exclude the molds at Matrix from the security they would likely have said so in the loan documents.

Further, the Bank had no obligation to notify Matrix that it was considering lending money to Stylemaster. The entire purpose of the lien recording system is to obviate the need for any creditor to engage in such an effort. The Bank could have reasonably concluded that the absence of any lien recorded by Matrix meant that Matrix did not claim or have a lien on Stylemaster molds.

### Matrix's Claim Under Tool and Die Lien Act is Trumped by the Banks Earlier Perfected Lien

Matrix argues that its Tool and Die lien attached in November 1994 when it performed processing work with the "40 inch under bed mold" for which it was not fully paid, and continued thru the following seven years as it did processing work on additional Stylemaster molds, without full payment. Hence, Matrix contends that its lien covers all sixty-two molds in its possession and trumps the Bank's November 1997 UCC–1 filing. The Bank argues that Matrix's lien was extinguished in 1999 when it was (as stipulated) fully paid for

all pre 1997 processing work, and that the 1997 Bank lien agreement gave it a lien from that date on all Stylemaster molds including therein held by Matrix. Once the Matrix lien claim was extinguished by payment in 1999, the Bank's lien achieved priority over any post 1999 Matrix claim of statutory lien.

The Illinois Tool and Die Lien Act provides:

§ 1. Lien. Plastic or metal processors or persons conducting a plastic or metal processing business shall have a lien in the tools, dies, molds, jigs, fixtures, forms or patterns in their possession belonging to a customer, for the balance due them from such customer for plastic or metal processing work, and for all materials related to such work. The processor may retain possession of the tool, die, mold, jig, fixture, form or pattern until such balance is paid, subject only to a security interest properly perfected pursuant to Article 9 of the Uniform Commercial Code.

770 ILCS 105/1.

 Matrix relies upon the first sentence of the Act which uses the plural term "molds" to refer to chattel subject to the lien. According to Matrix, it is the first sentence that grants a blanket lien in all of the debtor's molds, while the second sentence merely allows the lienor to retain possession of the molds until payment is made. Such a construction violates the maxim that a court must attempt to give meaning to every word of a statute. *Young v. Brashears,* 560 F.2d 1337, 1345 (7th Cir.1977) (citation omitted). Further, Matrix's interpretation makes the second sentence redundant because it restates that the lien is a possessory lien, which is already stated in the first sentence. Moreover, the legislature is presumed to

have known the common law when it enacted the statute. *City of Chicago v. Nielsen,* 38 Ill.App.3d 941, 349 N.E.2d 532, 538 (1976); *Reeves v. Eckles,* 77 Ill.App.2d 408, 222 N.E.2d 530, 531 (1966). Therefore, the term "lien" will be given its common law meaning, unless there is clear evidence in the statute itself that the legislature intended otherwise or the statute cannot possibly be reconciled with the common law. *Nielsen,* 349 N.E.2d at 538; *Eckles,* 222 N.E.2d at 531. There is no repugnance between the Act and the common law, nor did any express language in the Act show the legislature intended to repeal the common law.

The term "lien" is a term of art that modifies the list of chattels in both the first and second sentences of the Act by defining the scope of the interest in the chattels. Thus, a review of the common law rules for possessory liens will help to construe the extent of a lien under the Tool and Die Lien Act. A bailee's possessory lien upon chattels that he works upon or improves is one of the earliest common law liens. Restatement (First) of Security § 61 (1941) Comment on Clause (a). That lien was allowed because early common law barred an action on a contract unless there was a specific promise. *Id.* Thus, if a bailor asked an artisan to work on a chattel but did not agree to pay his price beforehand, the artisan was left without a cause of action. *Id.* Therefore, the possessory lien was allowed to protect the artisan, and such liens were preserved when actions for quantum meruit became actionable. *Id.* The bailee lien does not require improvement to the chattel, merely that the lienor worked upon the chattel at the bailor's request. *Id.* at Illustration (d). However, the lien "is limited to work actually performed upon the chattel itself." *Id.*[3] Moreover, a possessory lien is extin-

---

**3.** The only exception is where the chattels are delivered as part of a single contract. Thus, if

guished by payment of the debt that the lien secures. Restatement (First) of Possessory Liens § 78.[4]

Clearly, Matrix did not receive the 62 molds that are the subject of the current dispute under a single contract. They were received over a seven-year period. There is no evidence that there was any over-arching single contract covering the processing work performed during this period. Rather, it appears that the parties had a series of many different contracts. For example, Wenk testified that the first molds received by Matrix were the "40 inch under bed storage units," next he negotiated a deal with Williams to shift production from CMA and Abel to Matrix, and eventually Matrix received new molds that were shipped directly from the manufacturer in Portugal. Further, evidence adduced at trial showed that the parties did not have a requirements contract. Rather, as Stylemaster received orders from its customers it would then ask Matrix if it would agree to produce the parts needed to fill the order. Wenk Tr. at 69 line 23; Def.'s Ex. 63(c) MAX03520. Thus, Matrix's asserted lien under the Act actually consisted of many asserted liens, some of which were prior in time to the Bank's lien but were paid off, and others that came after the Bank perfected its lien.

■ The former liens were extinguished in December 1999 when Stylemaster fully paid the pre 1997 debt owed to Matrix. Liens are parasitic. As made clear by a Seventh Circuit panel opinion, they attach only to specific chattel under a

particular bailment. *Unisys Finance Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir.1992). Once the underlying claim that the lien secures is paid, as in this case, the lien disappears. *Id.*

Matrix offers a single case in support of its proposition that a possessory lien is a revolving lien that encompasses all of a debtor's property to secure payment of the total debt owed to an artisan. In *Chemical Bank v. Communications Data Services, Inc.*, 765 F.Supp. 1401 (S.D.Iowa 1991), the court interpreted Iowa's artisan's lien statute and concluded that a bank's perfected security interest was primed by a prior artisan's lien even though the debt existing prior to the bank's lien had been fully paid. In *Chemical*, the artisan was a magazine subscription service that had administered a customer subscription list for the debtor, a magazine publisher, since 1979. *Id.* at 1402. The parties had executed a series of contracts governing their relationship, though it is unclear from the opinion whether the contract was still in force in 1988 when the bank took its security interests in all of the publisher's assets, including the customer list held by the subscription service. *Id.* What is clear is that the subscription service continued to provide services to the publisher even after the bank perfected its lien. *Id.* at 1403–03. The publisher defaulted on its bank loan in 1990 and ceased publication. *Id.* However, it owed more than $300,000 to the subscription service for work performed be-

---

B brings two watches and a clock to jeweler for repair and the jeweler later allows B to take the two watches, the jeweler can retain the clock until all charges are paid, because all of the chattels were delivered under a single contract. Restatement, *Id.* at Illustration (5). Conversely, if the facts were the same except that B had brought the watches on one day and the clock on the next, the

jeweler would have a lien on the clock only for the amount due for work on it. *Id.*

4. For example, if the jeweler above agrees to repair a watch for $5 and the customer pays that amount, the lien is terminated even though the customer owes the jeweler for an earlier repair. *Id.* at Illustration 1.

tween September 1989 and December 1990. *Id.*

The secured bank in *Chemical Bank* argued that the competing artisan's lien expired once the subscription service was paid for the services rendered prior to the bank filing its lien, and that it had priority over any lien occurring after 1988. *Id.* at 1404. But the court disagreed, holding that the artisan's lien attached in 1979 and continued through 1990 because the subscription service continued to provide services during that period, and that the bank's intervening lien was therefore not prior in time to the artisan's lien. *Id.* at 1405. The opinion reasoned that to hold otherwise would subvert the statutory requirement under Iowa law that only prior liens could prime an artisan's lien and place an undue burden on artisans, by requiring them to check public records to see if property that it is working on has been mortgaged. *Id.*

■ This reasoning is unpersuasive. First, *Chemical Bank* represented a break with the common law rules governing possessory liens. As discussed above, a common law artisan's lien attaches to specific chattels under a bailment, and cannot be extended into the indefinite future. The court in *Chemical Bank* failed to discuss the common law artisan's lien and thereby violated the rule of construction that requires courts to consider the common law when construing the meaning of a statute. *Pierson v. Ray*, 386 U.S. 547, 561, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (citation omitted). Moreover, there is a good policy reason for limiting an artisan's lien to the chattel that the work was performed upon. A revolving possessory lien would wreak havoc on businesses such as Stylemaster. Banks would require borrowers to pay any debt owed to a tool maker before a loan would be made, which would effectively prevent them from obtaining a loan. For

instance, Stylemaster owed Matrix more than $2 million in November 1997, which was more than the entire credit line that it obtained from the Bank. Ironically, the result would be to hasten the collapse of the vendors that companies like Matrix depend on for their survival. Secondly, it is not an onerous burden to require a tool maker to check the filing office before extending additional credit to a debtor. The law requires the same of all creditors.

Matrix asserts that unless its view of the Act is adopted, debtors will be able to destroy a Tool and Die lien by simply taking out a loan. However, this is absurd. Any prior lien held by a tool maker would be unaffected by such a loan. The only way for a debtor to extinguish a lien under the Act would be to fully pay the debt that it secures. Until the debt is fully paid, any subsequent lien will be subordinate to the tool and die lien.

Contrary to Matrix's argument, interpretation of the Act applied here is in complete harmony with Sections 9–322 and 9–333 of the Illinois Commercial Code. Section 9–322 is simply a restatement of the "first in time first in right" rule governing lien priority. 810 ILCS 5/9–322. Nothing in the foregoing reasoning alters that rule. Matrix had priority when the Bank's lien was perfected in November 1997, but that priority was lost when its lien was extinguished by the payment of the underlying claim. Section 9–333 states that a possessory lien has priority, unless it is created by a statute that provides otherwise. 810 ILCS 5/9–333. The Tool and Die Lien Act falls in that exception because it expressly states that the lien created by the Act is "subject" to a properly perfected security interest under Article 9 of the Commercial Code. 770 ILCS 105/1.

Finally, the plural term "molds" in the first sentence of the Act does not expand

the scope of a possessory lien under common law. Rather, that sentence relates to circumstances where the artisan's lien extends to multiple items that were delivered under a single contract. This interpretation is reenforced by the second sentence which is consistent with the common law rule that a lien attaches to specific chattels under a bailment for repair or enhancement to property.

### Matrix Did Not have An Artisan's Lien on Molds in Its Possession

Matrix asserts that in addition to its tool and die lien for processing work on Stylemaster molds, it has a common law artisan's lien for repairs and enhancements to those molds. The Bank counters that (1) the Tool and Die Lien Act repealed the common law artisan's lien, (2) Matrix has failed to establish that it had an artisan lien even if such a lien still exists under Illinois law, and (3) Matrix's artisan's lien claim is barred by laches. Thus, the court must decide if the common law artisan lien survived the enactment of the Act and, if so, did Matrix prove-up its artisan's lien claim at trial.

### In Illinois the Artisan Lien Survived Enactment of the Tool and Die Act

The common law artisan's lien, like a tool and die lien, is a possessory lien. However, an artisan's lien only arises where the lienor has preserved or enhanced the subject property. *Affiliated Bank v. Evans Tool and Manufacturing Co., Inc.*, 229 Ill.App.3d 464, 170 Ill.Dec. 603, 593 N.E.2d 145, 148 (1992); *Navistar Financial Corp. v. Allen's Corner Garage*, 153 Ill.App.3d 574, 106 Ill.Dec. 530, 505 N.E.2d 1321, 1323 (1987) (mere towing of a vehicle did not enhance its value). Thus, it does not include processing work performed using a debtor's property. *Affiliated*, 170 Ill.Dec. 603, 593 N.E.2d at 148 (molder's processing work did not create an artisan's lien). Artisan liens are con-

sensual and can only be created by agreement, the rule of law, or by usage of trade or commerce. *Navistar Financial*, 106 Ill.Dec. 530, 505 N.E.2d at 1323. An artisan's lien has priority over prior perfected security interests, unless it is a statutory lien and the express language of the statute subordinates it to prior security interests. *National Bank of Joliet v. Bergeron Cadillac, Inc.*, 66 Ill.2d 140, 5 Ill.Dec. 588, 361 N.E.2d 1116, 1117 (1977).

The Bank argues that the Illinois Tool and Die Act 770 ILCS 105/1, et seq. (the "Act") should be construed to repeal the common law artisan's lien. It's argument is based on the absence of language which states that the remedy contained in the Act is "in addition to, and shall not exclude" common law liens. It points out that such a reservation was made in the Labor and Storage Lien Act 770, 45/1–1. Thus, the Bank invites the court to rule that by implication the Tool and Die Act repealed the common law artisan's lien.

It is settled law that repeal of common law by implication is disfavored in Illinois. *City of Chicago v. Nielsen*, 38 Ill.App.3d 941, 349 N.E.2d 532, 538 (1976). There is no presumption that the enactment of a statute abrogates the common law on the same subject. *Robben v. Obering*, 279 F.2d 381, 383 (7th Cir.1960) (unless repealed by statute, common law is in full force and effect); *Skilling v. Skilling*, 104 Ill.App.3d 213, 59 Ill.Dec. 937, 432 N.E.2d 881, 887 (1982) (no presumption that statute is to be exclusive and to abolish common law). Rather, a statute must explicitly abrogate the common law before it will be construed as a repeal of common law. *Skilling*, 59 Ill.Dec. 937, 432 N.E.2d at 887. Further, statutes will not be abrogated by implication unless there is such repugnance between the statute and the common law as to make it impossible for both to be given effect. *Reeves v. Eckles*,

222 N.E.2d at 531. Such is not the case here. The Tool and Die Act is not incompatible with a common law artisan's lien. In fact, as was pointed out in *Affiliated Bank*, the two liens are predicated on different rights. *Affiliated Bank v. Evans Tool and Manufacturing Co., Inc.*, 170 Ill.Dec. 603, 593 N.E.2d at 148. The Act secures payment for work performed to produce goods on behalf of a debtor, while an artisan's lien arises from a creditor's enhancement of the debtor's property. *Id.*

Moreover, the Bank's assertion that the legislature intended to abolish common law liens is contradicted by the fact that the revised Article 9 recognizes possessory liens which are created "by statute or rule of law." 810 ILCS 5/9–333. This statute replaces the former Section 9–310 which had been held to apply to artisan's liens. *National Bank of Joliet*, 5 Ill.Dec. 588, 361 N.E.2d at 1117 (1977). Thus, the legislature is presumed to have been aware of this fact when it reenacted this statute in the revised Article 9. A ruling that the Tool and Die Act abolished common law liens would render the language in Section 9–333 as a nullity.

### Matrix did not Establish an Artisan's Lien by Preponderance of Evidence

Wenk testified that in 1995 he and Williams reached an agreement for Matrix to defer repair bills for work on Stylemaster molds. Wenk Tr. at 70–71, 73, 75, 86,105. He said that under the agreement the molds at Matrix would be treated as if they were owned by Matrix. *Id.* at 71. Williams allegedly guaranteed that the molds would never be moved until all repair bills were paid. *Id.* Wenk further testified that it was Matrix's responsibility to keep track of the repair cost. Wenk Tr. at 76. Williams denied that there was any such agreement to defer repair cost. Williams Tr. at 34.

Matrix had the burden of proving existence of a repair contract by preponderance of evidence. This it has failed to do. There is no writing setting forth the agreement to defer repair cost that Wenk testified to. Wenk admit that he has no documentation specifying the terms of the alleged contract, not even an e-mail or a letter exchanged between the parties. Wenk Tr. at 105. This is also the case as to his claim that there was an agreement to defer debugging costs on Stylemaster molds, which supposedly started in 1998 and continued through 2002. Wenk Tr. at 157–58. Moreover, Wenk said that he never discussed the cost of repairs with Williams and never issued any invoices for repairs during the alleged contract period, between 1995 and 2002, nor did he record any receivable related to repair work on Stylemaster molds in his financial records. Wenk Tr. at 167–68, 162, 198. When Wenk was asked why Matrix did not issue invoices for repair work, he said it was because Stylemaster would not accept them. Wenk Tr. at 198. But this excuse contradicts Wenk's claim that Matrix was supposed to keep a running tally of repair cost. Moreover, it is not credible that an experienced businessman would not account for a supposed $600,000 receivable in his financial records, or that he would not issue any bills for a seven-year period because the customer would not accept them. One would also expect that Wenk would have told his key employees about the agreement with Stylemaster. But Wenzlaff, who ran Matrix's tool room, testified that his knowledge of the agreement was "vague." Likewise, Loretta Lane, Matrix's office manager, apparently was unaware of the alleged agreement to defer repair cost when she began during the year 2002 compiling asserted repair costs related to the claim of artisan's lien. Lane Tr. at 21–22.

Finally, Wenk's testimony was contradicted in several key respects. First, he testified that under the repair agreement the molds at Matrix could not be removed unless all repair cost were paid. But Wenk admitted on cross that Stylemaster had removed molds from Matrix. Wenk Tr. at 178. Second, contrary to Wenk's claim that repair bills were deferred under the contract, the record shows that Matrix did invoice repairs to Stylemaster during the relevant period. See Pl.'s Ex. 3. Further, contrary to his claim that he was not paid for debugging Stylemaster molds, the record shows that Cost Reductions paid thousands of dollars to Matrix for debugging Stylemaster molds. Findings of Fact ¶ 36. Moreover, while Wenk claimed that he did not receive "ten cents" for debugging the so-called "monster mold," he later admitted receiving more than $8,000 for work on that mold. Wenk Tr. at 104; Wenk Tr. for January 21, 2003 at 41.

Lastly, even assuming *arguendo* that Matrix and Stylemaster had agreements to defer repair and debugging cost, the evidence as to claimed value of Matrix's services was manufactured by its employees in 2002. Such material prepared on the eve of trial to document events many years earlier were sought to be admitted as ordinary course business records. But such materials at trial cannot be given great weight or credibility, and was insufficient to sustain its burden of proving its asserted damages. Matrix's people spent more than 600 hours in 2002 creating the bills and records to support its artisan lien claim. Some of the evidence adduced by Matrix was based on conversations with employees about work that they allegedly had done seven years earlier. Other evidence was based on Wenzslaff's review of voluminous time sheets and Tool Room Profiles to discern whether a particular set-up was related to a repair or a production run or whether an entry for cleaning and polishing a mold was routine maintenance (which should not have been charged) or a chargeable repair. The Tool Room Profiles for 1994–1996 were not created until 2002, and more than $70,000 of the labor charges listed therein are unsupported by any time sheets. Rather, Matrix relied on tool room logs that do not describe the work done or the amount of time spent on a repair. Moreover, some of the handwritten descriptions on the time slips that were supplied are questionable because it appears that they were added to the time slips in 2002, in preparation for this litigation and the trial. Further, Matrix has submitted more than $4,000 in duplicate billings or charges assigned to the wrong mold. And there are more than $3,500 in charges related to third-party invoices that do not specify any Stylemaster mold.

Finally, there were hazards in relying on the memory of employees with a natural interest in the outcome of this litigation to substantiate Matrix's artisan lien claim. This was amply demonstrated by inconsistencies in Wenzslaff's testimony. For example, he testified that if he was unable to find a time slip supporting a repair, he would mark the entry as routine maintenance, which meant Stylemaster was not billed. However, on cross Wenzslaff was shown entries that were unsupported by any time slips that were billed as repairs. Another time slip from 1995 was blank, so Wenzslaff was asked how he was able to determine how much to charge, and he replied that he asked the toolmaker how many hours the repair took, but that conversation occurred in 2002. Matrix's counsel attempt to brush these flaws away by asserting that damages do not have to be proven to a level of mathematical certainty. However, the evidence presented by Matrix fails even minimum standards of competency. The Court is not required to

give great weight to manufactured evidence based on undocumented recollection of events taking place seven years earlier, or to partial evidence recorded at the time that did not substantiate the dollar claims.

In sum, the supposed agreement was not established, and even if it had been Matrix failed to show that it had an artisan's lien for particular proven work by it on Stylemaster molds. The Bank's laches defense need not be considered because that defense is obviated by the holding that Matrix did not establish an artisan's lien by preponderance of evidence.

### CONCLUSION

For reasons stated, judgment will separately enter against Matrix and in favor of the Bank.